29 U.S. 232
 4 Pet. 232
 7 L.Ed. 842
 JOHN P. VAN NESS, AND MARCLA HIS WIFE,
COMPLAINANTS, APPELLANTS
v.
THE MAYOR, ALDERMEN, AND BOARD OF COMMON COUNCIL OF THE
CITY OF WASHINGTON, AND THE UNITED STATES OF
AMERICA, DEFENDANTS.
 January Term, 1830
 
 1
 APPEAL from the circuit court of the district of Columbia, for the county of Washington.
 
 
 2
 The original bill in this case was filed the 16th of April 1823. It set forth that the complainant, Marcia Van Ness, was the only child and heir at law of David Burns, deceased. That Burns was, in his life time, and particularly on the 6th of July 1790, seised and possessed of a considerable tract of land, within the limits of the present city of Washington; that a part of this land constitutes so much of the land mentioned in the second section of an act of congress, of May 7, 1822, c. 96, as is indicated in a map annexed to the bill of complaint by the words 'Reservation No. 10, 11, and 12, on the north side of the Pennsylvania Avenue.'
 
 
 3
 That by virtue of the said act of congress, the corporation of the city of Washington have proceeded to lay off and divide the said land into lots; that they have sold some, and are about to sell others; that the land thus disposed of is to be held by the purchasers for their own private use and exclusive benefit; and the bill complains of these proceedings as a breach of trust.
 
 
 4
 It avers that on the 6th of July 1790, an act of congress passed, establishing the temporary and permanent seat of government of the United States. By this act the president was authorised to appoint commissioners who were authorised to purchase or accept such quantity of land within the district as the president might deem proper for the use of the United States, and according to such plans as the president should approve. By virtue of this act, various proposals were made concerning cessions of land for the site of the city of Washington: the substance of which proposals was, that the president might retain any number of squares he might think proper for the public improvements, or other public uses, and that the lots only which should be laid off should be a joint property between the trustees on behalf of the public and each of the three proprietors, and that the same should be equally divided between the public and the individuals, as soon as might be after the city should be laid off.
 
 
 5
 For the streets the proprietors were to receive no compensation. For the squares and lands in any form which should be taken for public buildings or any kind of public improvement or uses, the proprietors, whose lands might be so taken were to receive compensation, &c.
 
 
 6
 On the 28th of June 1791, David Burns, by his deed, conveyed to Thomas Beall and John Mackall Gantt, in fee simple, for the purposes and trusts therein mentioned, a considerable quantity of land, part of which constitutes the land described in the act of May 7, 1822.
 
 
 7
 The whole of the land thus conveyed to Beall and Gantt was afterwards, 30th of November 1796, conveyed by them to the commissioners appointed under the act aforesaid, upon the same trusts and uses as are expressed in the deed of conveyance to them.
 
 
 8
 The plan of the city as originally projected by L'Enfant, improved and matured by Ellicott, was approved and adopted in 1792, by the president of the United States. According to this plan, the land described is within the operation of the act of the 7th of May 1822, except so much thereof as may have been sold by virtue of an act of February 24, 1817, entitled 'an act authorising the sale of certain grounds belonging to the United States in the city of Washington.' The complainants are ignorant of the extent of these sales, but claim all which may thus have been disposed of.
 
 
 9
 The map referred to in the bill, exhibits the division that was made, under the direction of the corporation, of the land in question into lots, and is the guide by which the sales have been conducted. A part of the land in question was not reserved for public improvements or other public uses, but belonged to a street called North B street.
 
 
 10
 The complainants aver that the land in question, if sold to private individuals to be held by them for their individual benefit, will be placed entirely out of the reach of the trusts and purposes which were intended to be created and secured by the deed and agreement aforesaid. The complainants are advised this cannot be done without their consent, which they are willing to give upon the terms of the original contract. They are willing to occupy the same ground they would have occupied if what is now proposed to be done had been proposed in 1792: that is, that the land then reserved as public squares and streets, and now designed to be divided into private building lots, should be divided between them and the United States, or the corporation claiming the title of the United States.
 
 
 11
 The complainants refer to an act of May 6, 1796, authorising a loan for the use of the city of Washington, and to other acts of congress, as uniformly holding out the ides that the land in question is not subject to congressional control. They refer also to the proceedings of the commissioners in Davidson's Case, in January 1794, a copy of which is annexed; and to the opinion of the attorney general in that case.
 
 
 12
 The complainants aver that they have presented their claim to the corporation of Washington, and to the commissioners appointed by the corporation, and urged a postponement of any further sale.
 
 
 13
 On the 19th of May 1826, the complainants filed an amended bill, the substance of which is:
 
 
 14
 That Marcia Van Ness, the complainant, is the only child and heir at law of David Burns, deceased; that David Burns, in his life time, was lawfully seised in fee of the premises in question; that under an act of congress of July 16, 1790, and a supplementary act of March 3, 1791, proposals were made by and on behalf of the president, thereto lawfully authorised, to various persons then the owners of different portions of land lying within the present limits of the city of Washington, relating to the purchasing and accepting from the proprietors, various parts of their lands lying within the limits aforesaid. In consequence of such proposals an agreement was finally made between the proprietors, among whom was David Burns, and the United States, the terms and nature of which are set forth in an entry under date of April 1791, in a book, &c. as set forth in the original bill. On the 28th of June 1791, David Burns, in pursuance of the agreement and arrangement as aforesaid, made and executed his deed of conveyance to Beall and Gantt, as set forth in the original bill. Beall and Gantt conveyed, as recited in the original bill, (setting out the trusts.) Afterwards, on the 13th of December 1791, the president transmitted to congress a plan of the city which had been adopted as the permanent seat of government; that subsequently, various alterations were made in the same, at different times, under the authority and sanction of the president. Many building squares have been introduced, in addition to those contained in the plan originally adopted; alterations have been made in the number and directions of the streets; in the dimensions of the building squares and public appropriations; and in all such cases, when such alterations have been made and those pieces of ground which had been at any time appropriated as streets, or public reservations, have been subsequently converted, either in whole or in part, into building lots, the variations have been by the mutual consent of the United States and the original proprietors respectively; and the lots in such building squares have been, uniformly, divided between the United States and such original proprietors.
 
 
 15
 They insist that such mutual consent and such distribution were not only required by the true meaning and legal and equitable interpretation of the original compact and agreement, but such practice acquiesced in by both parties ought to be deemed and received as the mutual understanding and design of the parties at the time of entering into it.
 
 
 16
 In pursuance of such original agreement and of the acts of congress, the president did select and appropriate for streets, squares, parcels and lots, for the use of the United States, all the premises herein before described, lying on the north and south sides of the Pennsylvania avenue, as aforesaid; being part and parcel of the premises as herein before mentioned, conveyed and transferred by the said David Burns to Beall and Gantt, upon the trusts and confidences mentioned and declared in the deed of conveyance. That for all said premises neither Burns in his life time, nor the complainants since his death, have received any other consideration than such as is set forth in the deed, either from the trustees or from the United States. The said parcels of land continued to be held for the use of the United States as a public street or streets, or public appropriation, according to the plan and selection, until an act of congress, entitled 'an act authorising the sale of certain grounds belonging to the United States in the city of Washington,' was passed, February 24, 1817; which act was procured at the instance and by the consent of the corporation of the city of Washington. Under this act the commissioner of the public buildings in the city of Washington was authorissed to lay off into building lots and to sell a portion of them, being part of the premises herein before described as lying on the north side of the Pennsylvania Avenue.
 
 
 17
 The residue of said premises continued to be held for the public use as aforesaid, until an act of congress was passed on the 22d of May 1822, also procured at the instance and with the consent of the corporation, entitled, 'an act to authorise and empower the corporation of the city of Washington, in the district of Columbia, to drain the low grounds,' &c.
 
 
 18
 These acts of congress are charged to be a clear and manifest departure from the terms and spirit of the original agreement and compact between Burns and the United States. The object and effect of them is to divert the premises from the trusts expressed and declared in the deed; that under such deed an interest still remained and continued in David Burns, which on his death descended to and now remains vested in the complainants; that the said acts of congress were passed without their concurrence or consent, and that the constitutional power of congress and the rights of complainants, will not permit or sanction the sale of the premises to private parties, without such assent and concurrence.
 
 
 19
 The complainants insist, and submit to the court, whether the legal operation and effect of said acts be not to determine the trusts originally created as to said premises, and to revest the same in them; and whether, if tney choose to assent to such appropriation of the premises, the same are not thereby immediately subject to the same trusts an in and by the indenture were expressed and declared as to all those portions of the premises thereby conveyed, as were not deemed proper and necessary by the president; or whether the complainants are entitled to the whole, or simply to a moiety of the money arising from said sales.
 
 
 20
 The bill proceeds to set forth, that under the act of February 24, 1817, the commissioner was authorised to sell any number of the lots therein mentioned, not exceeding one half: and that by the act of May 22, 1822, the corporation of Washington was authorised to sell and dispose of the right of the United States of, in, and to the building lots therein mentioned: and if by virtue of said acts, any sales have been or shall be made previous to ascertaining and settling the rights of the complainants, much confusion, perplexity and trouble may ensue as well to the corporation and the individual purchasers, as to the complainants.
 
 
 21
 Whereas, in and by the said last mentioned act, it was expressly enacted that it shall and may be lawful for the lawful representatives of any former proprietor of land directed to be sold, &c. at any time within one year from passing of the same, to institute a bill of equity in the nature of a petition of right against the United States in this honourable court, in which they may set forth the ground of their claim to the land in question, the complainants do within the terms of said act present their bill and claim such relief in the premises as may be conformable to the provisions of said acts, or agreeable to equity and good conscience.
 
 
 22
 And inasmuch as the corporation of Washington is authorised by said act of congress to carry the provisions of the same into effect, and deny any right or interest to the premises, or any part thereof to be in complainants, but claim a right to sell and dispose of the entire premises, and the exclusive right to receive and appropriate all the proceeds of the sales to their own use and benefit, and give out and insist that the complainants have no claim in law or equity to the land or proceeds, and have proceeded to carry the act of congress into operation; they pray, &c.
 
 
 23
 To this bill the defendants filed their joint and several demurrer, plea and answer; the substance of which is, they claim the benefit of all the prior exceptions and grounds of demurrer and plea heretofore taken to the original bill, and deny the equity of the bill. They specially set forth——
 
 
 24
 1. That the subject matter of complainant, the title therein pretended, and the entire relief prayed, are against an act of congress passed in the due exercise of a legislative discretion and constitutional power; and therefore not cognizable before any municipal court.
 
 
 25
 2. That the complainants have not shown any title, or any individual and proprietary interest in themselves; but a mere participation of the general interest inherent in them as members of the community at large, in common with all the citizens of the United States in the administration of a public trust by the government.
 
 
 26
 3. They deny that the complainants have equity; and assert that if they have any title to the land, it may be established at law.
 
 
 27
 4. That the bill is defective in its frame, scope and end. Because it is multifarious, and purports to have joined therein several matters and claims of different natures, and repugnant characters. It is uncertain as to the nature, extent, and degree of the relief claimed, and as to the party against whom it is prayed. It prays no process, except an injunction against the corporation.
 
 
 28
 5. It is not in the nature of a petition of right, demanding any portion of the money arising from the sales of the lands, and merely setting forth the complainants' title to the land, to lay a foundation for their claim to the money, or to a portion thereof, as authorised by the act of congress; but it purports to claim against, and in derogation of the authority of said act, and to draw the United States into suit touching this claim. The United States and the corporation are joined in the suit, contrary to the design of the act, and without showing or alleging any interest in the corporation.
 
 
 29
 The defendants, by way of answer, admit that David Burns was seised, and did convey, as averred in the bill, and that the trustees conveyed to the commissioners as therein set forth: that the whole of the lands thus conveyed, except so much as from time to time has been divided and reconveyed, or has been sold or otherwise disposed of, still remains vested in the United States, or their officers or agents, absolutely and perpetually, for the use of the United States. The defendants insist, that the legal as well as equitable estate has become vested in the United States, or at all events, that the legal interest has passed to the commissioner of public buildings, in trust for the United States. In either case, they insist that the United States have the only beneficial interest and estate, and the absolute dominion and disposal of the same; and that congress may and ought to dispose of the same on the terms and in the manner most advantageous to the general interest. They admit that about five hundred and forty-two acres were reserved for the use of the United States, and not allotted and divided: that these lands thus reserved were purchased at the rate of twenty-five pounds, or sixty-six dollars and sixty-six cents per acre, paid out of the public treasury, which price was more than three-fold the market price or real value, independently of the adventitious and speculative valuation, superinduced by making this the permanent seat of government. The lands thus purchased for the use of the United States, and for which there was no responsibility to the original proprietors beyond the payment of the stipulated price, were distributed throughout the city, and were commonly known and distinguished as reservations, numbered from No. 1 to 17 inclusively. Of these the commissioners accounted with David Burns in his life time, for about one hundred and ten acres, and paid him two thousand seven hundred and fifty pounds, or seven thousand three hundred and thirty-three dollars and thirty-three cents; but without any specification of the boundaries or lines.
 
 
 30
 All the lands described in the second section of the act of May the 7th, 1822, and which the corporation is authorised to lay out and sell, consist of parts of the reservations so purchased as aforesaid, excepting that part over which No. 10 is directed to be extended to Pennsylvania avenue, which comprises so much of B street as lies between said avenue, and said reservation, and was so taken in order to square out to said avenue the house lots into which the reservation was to be divided.
 
 
 31
 It is admitted that the part of B street, any more than the residue of the street, or the other streets, was not, when originally purchased for the use of the United States, set down at any price, specifically appropriated to such parts of the property; but was included as an appendage in the purchase of the general mass of property paid for at the rate of twenty-five pounds per acre, without being taken into the computation of the area to be paid for at that rate.
 
 
 32
 The defendants deny that there was any agreement, condition, understanding or trust, express or implied, between the United States, or any of their officers, agents or trustees, and the original proprietors or vendors; or that any thing was given out or promulgated in the form of proposals or otherwise, either before or after the consummation of the contracts and conveyances by which the lands were sold and conveyed for the use of the United States as aforesaid, importing or implying, or in any manner holding out the idea, hope, or expectation, that the lands, or any part or parcel of the same, should be perpetually and inalienably retained as public property, or dedicated to any particular object of public improvement; or that the general declaration of use should be limited, and restramed, so as to control the discretion of the government or congress of the United States in the use or application of the property. Except that these defendants have heard and believe, that at a very early stage in the adjustment of the plan of the city, the two principal quarters of the city, and the particular appropriations of ground for the sites of the president's house and executive departments and capitol, were dosignated, and an implied pledge of the public faith was held out, not merely to the original proprietors, but to the public in general, that those great improvements should be permanently distributed and seated; but as to all the residue of the lands so purchased for the use of the United States, it was to remain at the absolute disposal of congress.
 
 
 33
 The defendants have been informed, and believe, that the intent and object for keeping such extensive reservations of land in the heart of the city unappropriated, were to leave the hands of the government unfettered, and its discretion uncontrolled to dispose of such reservations in furtherance of such future and contingent purposes and views of improvement, ornament, or utility, a were not contemplated or provided for in the original plan; and to leave the government at full liberty to modify and improve such plan according to such future and contingent views. That the practice of the government, its officers, agents and trustees, has always been conformable to this view of the uses and objects to which it was originally destined. If any of the reservations have received names as if appropriated to particular objects, they have been merely popular and arbitrary; and nor from any authority, or founded on any pledge or trust, public or private, that they should be so appropriated. Whenever the public convenience has been thought to require it, the lands have been applied without regard to such popular and arbitrary designations, or to any such terms or conditions as the complainants pretend. That the specific purposes and objects designated in the act of congress for the application of the proceeds, are of the first importance and highest public utility, in reference to the primary design of laying out and embellishing a splendid, populous, and well ordered capital; which was to be reclaimed from wasted tobacco fields and noxious morasses; and that without the improvements to be accomplished by these means, the city never can fulfil the ends and purposes for which it had been selected, as the permanent seat of government.
 
 
 34
 The corporation, answering for themselves, further say, that without delay a board of five commissioners was organized for the purpose of carrying into execution the act of 1822, according to certain directions in the act, and in the ordinance of the corporation: that the commissioners did proceed to lay off the parcels of ground into squares and building lots, and proceeded to make sale of some of them, when they were stopped by the injunction issued at the prayer of the complainants. When the same was dissolved, they again proceeded, and have disposed of the greater part of the same, and intend with all convenient speed to dispose of the residue. Of all which actings and doings, they are prepared to render an account, when they shall be so required and directed.
 
 
 35
 The complainants filed a general replication; and after argument, the circuit court dismissed the bill with costs.
 
 
 36
 The complainants appealed to this court.
 
 
 37
 The case was argued by Mr Coxe and Mr Taney for the appellants; and by Mr Berrien, attorney general, for the United States; and by Mr Jones and Mr Wirt, with whom was Mr Webster, for the corporation of Washington.
 
 
 38
 Mr Coxe, for the appellants, stated, that the claim of the appellants was founded on the admitted original right of the ancestor of Mrs Van Ness in the premises, and upon the contracts and conveyances by which he parted with these lands. It is contended:
 
 
 39
 1. That these conveyances and contracts did not vest in the United States an absolute and indefeasible title, but passed an imperfect and qualified estate, to which certain trusts and conditions were annexed, intimately connected and interwoven with the title; and the condition having been broken, and the trusts violated or run out, the estate granted has terminated.
 
 
 40
 2. If such should not be deemed the legal result from the facts in the case, the complainants will contend; that according to the only fair interpretation which can be given to the contracts in question, these premises must now be considered as if originally converted into building lots, and to be equally divided between the government and the original proprietor. Or,
 
 
 41
 3. That if the interest vested in the United States could not be divested without an actual sale to individuals, then, under one aspect of the case or another, the plaintiffs must be entitled to the whole or a moiety of the proceeds.
 
 
 42
 It is admitted that the soil originally belonged to David Burns, the father of the complainant Marcia. This could only be divested by his voluntary act. The right of sovereignty before the cession was in the state of Maryland.
 
 
 43
 The first article, section eighth, of the constitution of the United States, gives to congress the right of exclusive jurisdiction over the district; and in other cases. Under this clause, the right of sovereignty over the district is in the general government, and under the second section the right is recognized to acquire real property for certain designated and stipulated purposes.
 
 
 44
 It is a fair inference from this part of the constitution, that if congress can constitutionally acquire the ownership of property within any particular state, its rights are simply those of an individual; and the assent of the states must concur before the sovereign power can be vested. This is specifically provided for, as to the district of Columbia, by the cessions of Maryland and Virginia. Burch's Dig. 213, 218, 219.
 
 
 45
 Under these acts, as sovereign, congress has no right in or connection with private property, further than the states held, which ceded their jurisdiction. The rights of the United States are derived from individual authority, and are not granted by the states.
 
 
 46
 The whole foundation then of the government title to the real estate in the district of Columbia, rests upon compact with individual proprietors. All the powers which can be lawfully exercised over the property, must be derived from the same source. No rights can thus be created which the former owner did not himself possess.
 
 
 47
 The private compacts and conveyances which confer this right, must be subject to the same rules of interpretation and construction, as if they were contracts between private citizens. The government, in making these contracts, descends from its sovereign clevation, lays down its privileges and prerogatives, and places itself in all respects, as to right, upon a level with the individual citizen.
 
 
 48
 2. What then is the character, and what the terms of the conveyance and agreement under which the controversy arises?
 
 
 49
 Under the powers reposed in him by law, president Washington, having selected a site for the contemplated city, met the proprietors of the land covered by it on the 12th of April 1791, Burch's Dig. 332, when he made to them certain propositions, and explained his views relative to the same. The owners generally came to an agreement, which formed the basis of the various deeds of trust which were executed immediately after.
 
 
 50
 The language of this agreement is peculiar and unambiguous. The president is authorised 'to retain any number of squares, &c. he may think proper for public improvements, or other public uses.' The form of the conveyance is not alluded to, neither is the extent of the estate to be granted; the object exclusively regarded is the purpose for which the land is to be retained.
 
 
 51
 This agreement may be considered, in connexion with the legislative acts and the conveyances, as the contract between the parties. 4 Wheat. 656. It contains the stipulations which were to be executed by formal conveyances.
 
 
 52
 The conveyances to Beall and Gantt, the trustees, will be found to correspond with this agreement. The language of those conveyances is, 'to the said Beall and Gantt, and the survivor of them, and the heirs of such survivor:' the habendum is in these words, 'to have and to hold the hereby bargained and sold lands, with their appurtenances, unto the said Beall and Gantt, and the survivors of them, and the heirs of such survivor, to and for the special trust following, and no other, &c. And this trust is created by these words: 'and the said Beall and Gantt, or the survivor of them, and the heirs of such survivor, shall convey to the commissioners, &c. and to their successors, to the use of the United States for ever, all the said streets, and such of the said squares, parcels and lots, as the president shall deem proper for the use of the United States.'
 
 
 53
 It is obvious that the parties considered the contract as still executory; no legal title passed to the United States, or even to the commissioners; but a subsequent conveyance for this purpose was evidently contemplated. The abolition of the office of commissioner has prevented the execution of this design.
 
 
 54
 The agreement of the 12th of April 1791 must still be considered as substantially setting out the intentions of the parties; and although wholly informal, 'it is an agreement showing the intent of the parties, and therefore sufficient to declare a use.' 4 Mod. 264.
 
 
 55
 The Maryland act of cession refers to this agreement, as well as to the conveyance; and the inquiry is, what was the intention of the parties, as the same can be gathered from the documents referred to?
 
 
 56
 It embraces three distinct species of property: 1. The public streets. 2. The public reservations. 3. The building lots. All the ground within the limits of the city is comprehended within one or other of these descriptions.
 
 
 57
 The first were to be absolutely vested in the government without any compensation, further than such as should arise from the enjoyment of this public right of way. The second was to embrace the squares, parcels, and lots, which the president might deem proper for the use of the United States; or, as the original agreement expresses it, 'which the president might deem proper for public improvements, or other public uses.' These were to be paid for at the rate of twenty-five pounds per acre. 3. The building lots, which were to be equally divided between the United States and the original proprietors. All the premises in controversy in this case are comprehended within the two first descriptions.
 
 
 58
 If the language employed in this agreement and conveyance can receive any precise construction, it means, that the parties agree to convey, and did convey 'such squares, parcels and lots as the president might deem proper for the use of the United States.' If this be ambiguous, all doubt will be removed by reference to the terms of the agreement, where the property, as well as the object of the conveyance, is specifically described 'as lands in any form which shall be taken for public buildings, or any kind of public improvements,' and 'for public improvements or other public uses.' These then are the objects of the grant.
 
 
 59
 Where an agreement embraces a number of distinct subjects, which admit of being separately executed and closed, it must be taken distributively; each subject being considered as forming the matter of a separate agreement after it is closed. 11 Wheat. 237, 251. Cited also, 1 Coxe, 270. Sugden, 209. 12 Johns. Rep. 436.
 
 
 60
 It might have occurred that the land of one proprietor was appropriated to these public objects, and all that of another to building squares. The construction then to be given to the various matters must be the same as if three distinct conveyances had been executed after the plan of the city had been adopted, and with a specific appropriation of each portion of the premises.
 
 
 61
 A conveyance then of a particular tract of land to the United States 'for public improvements or other public uses,' 'for public buildings or any kind of public improvements,' or 'for a street,' would have fixed beyond a doubt the purpose to which the subject conveyed was to be applied, and would have constituted an agreement of the most solemn obligatory character.
 
 
 62
 3. Having ascertained the substance of the agreement, it is immaterial whether we consider the contract as creating a charity, a trust, an estate upon condition, a dediction to the public, or any thing else of a similar character.
 
 
 63
 In England it would have been deemed a charity. 4 Ves. 543. 7 Johns. Ch. Rep. 292. 5 Harr. & John. 392. 6 Harr. & John. 1. It is immaterial that we have no statute similar to that of 43 Elizabeth.
 
 
 64
 The object and effect of that statute appear to have been to give validity to certain dispositions of property, which otherwise would have been void. If, in the cases put, the will required the aid of the statute, such was its operation. If in this case, the assistance of a similar statute should be deemed necessary, it must be on the principle that, at common law, the conveyance would be void. If, however, no assistance is thus required, or should the various statutes under which these arrangements have been made legalise them, the trusts designated are valid as a charity.
 
 
 65
 But a charity must be accepted upon the same terms upon which it is given, or it must be relinquished to the right heir; for it cannot be altered by any new agreement between the heirs of the donor and the donees. 4 Wheat. Ap. 15. Finch, 222. 3 Merivale, 400, 401, 417.
 
 
 66
 Considering it as a condition annexed to the grant, that the land should be appropriated to 'public buildings,' or 'other public uses,' the result would be the same.
 
 
 67
 By the disposition the government has made of the premises, the sale of all its interests to individuals, it has misapplied this property, and deprived itself of the power to perform the condition. Such a misapplication was held in Porter's case to give to the heir of the donor a right of entry. 1 Rep. 16.
 
 
 68
 The interest created is, however, as well from the nature of it, as from the terms employed, nothing more than a trust in some of its modifications.
 
 
 69
 The contract is entirely executory in its character. It indicates the general object of a conveyance thereafter to be made. Even the deeds from the proprietors to the trustees were but a part execution of the agreement. They contemplated another instrument to convey the legal title to the United States.
 
 
 70
 The conveyance to the trustees being a deed of bargain and sale, the estate of the United States under it could be nothing more than an equitable one.
 
 
 71
 It is a settled principle, that no use to be executed by the statute, by force of such a conveyance, can be declared, excepting to the bargainee. 3 Johns. 383. 4 Cruise's Dig. 494. 16 Johns. 302.
 
 
 72
 To the whole extent of this controversy the contract is still executory, and completely within the control of a court of chancery; who in framing a conveyance will make it correspond with the intention of the parties.
 
 
 73
 This intention is to be collected from the original agreement. It is clearly established that without any strict adherence to the forms of instruments, the intent of the parties will operate. 4 Mod. 264. 2 Atk. 577, 582. 1 P. Wms, 123. 1 Bro. P. C. 288. 3 Bro. P. C. 31, 33. 3 Com. Dig. 587. 1 Jac. & Walk, 550. 1 Prest. on Est.
 
 
 74
 The beneficial interest under these instruments in the United States, is clearly an executory equitable interest. It rests in fieri, and the court will endeavour to ascertain the design of the parties in relation to the extent of this interest, and measure their rights by such intention. All trusts are, indeed, executory. 1 Cruise's Dig. 489. 1 Prest. 186.
 
 
 75
 If the view of the intention which has been taken is the correct one, the premises in question were to be apportioned exclusively to objects of a public character; to public improvements, or other public uses.
 
 
 76
 The property has however been diverted from these objects, and has been sold out to individual proprietors, and is now occupied and enjoyed by them for their private advantage. What then is the result of this misappropriation?
 
 
 77
 The rule of equity seems to be, that when the purpose for which a trust is created, either ceases or never comes into existence; it is to be considered as if it had never been contemplated. And the benefit of the estate upon which it has been charged, must result to those to whom the law gives the estate, in default of disposition by the right owner. This is the whole foundation of resulting trusts.
 
 
 78
 Estates vested in trustees for the purpose of raising money; if the power is never exercised, or the incumbrance is discharged, the estates granted to the trustees terminate. Estates vested in trustees to preserve contingent remainders; if the contingency never arises, or the estate in the trustee is at an end before it occurs, revert to the grantor. 1 T. R. 760. 4 Ves. 60. 2 Ves. 399, 406. 7 Com. Dig. 588. 1 Cruise's Dig. 475. Prec. in Chan. 541. 2 P. W. 20. 1 Prest. on Est. 182, 183.
 
 
 79
 This sale of the premises amounts to an abuse of the trust; and it can confer no right on the party abusing it, or on those who claim in privity with him. 7 Com. Dig. 619. 3 Maule & Selw. 574.
 
 
 80
 No beneficial interest vested in the trustees, Beall and Gantt. They took an estate for the single purpose of conveying it to the commissioners. In the execution of this power they were bound to regard the intention of the parties, without any scrupulous adherence to the phraseology of the conveyance. Whatever might be the nature of the words of the conveyance to them, nothing more passed to them than was necessary to enable them to execute the power confided to them.
 
 
 81
 If they could now be required to execute that power, and convey the premises in pursuance of it, in framing their deed they must look to and be governed by the obvious intention of the parties. Doug. 565, 573. 3 T. R. 665, 674.
 
 
 82
 If the formal parts of the conveyance should be deemed immaterial, and the equitable interests of the parties alone be regarded, this may be considered as a qualified or base fee in the premises, in the United States.
 
 
 83
 Qualified or base fees are, substantially, nothing more than fees upon condition. In general, the qualification is annexed to the person of the tenant; but it is not material whether it was annexed to the land or the person holding the land; whether the condition should be determined by the tenant personally, by an act different from that upon which the estate depended, or by the land being discharged of the condition.
 
 
 84
 In this case, it would be equally immaterial whether the language of the conveyance made it the personal duty of the tenant to appropriate the land for the designated purposes, or whether it required the land to be so applied. 1 Prest. on Estates, 431. The residuary estate is in the grantor. 1 Prest on Est. 117, 156.
 
 
 85
 Such a grant may well operate as a dedication to public uses; in which case it would also partake of the qualities of a trust, and be governed by the rules applicable to trusts. 2 Strange, 1004. 9 Cranch, 331. 2 Johns. 363. 12 Serg. & Rawle, 29.
 
 
 86
 Upon these grounds, or some of them, it is apparent, that by the operation of the acts of congress, to which reference has been made, and the sale to the individuals who have purchased, the premises have been discharged of the trust originally created. The public, to whose use they have been dedicated, have renounced the interest thus created; and the original proprietors are reinvested with their original title.
 
 
 87
 It is objected, that congress possess the powers of sovereignty, responsible to the entire people of the union, and answerable to the nation at large for the manner in which it discharges its duties and executes its powers. This is said, to exclude all claims for recompense for the exercise of these powers, by individuals. To this it is answered, that such political powers may belong to congress, and the position assumed may be true, so far as the rights of individuals are not by ocmpact connected with the operations of government. But, when it acts upon individual rights, the party whose person is violated, or whose property is invaded, is separated from the mass of the community; and if his case be one in which a court may act, he may invoke the constitution and law for his protection and indemnity.
 
 
 88
 Compacts may be made by the government, and individuals may acquire rights under those compacts. It is incompatible with our institutions to say, that holding these rights, government is acting as a sovereign, and is responsible only to the nation for its doings.
 
 
 89
 The property of individuals may be wrested from them by acts of the government; but it will not do, in a case where the law can interpose, that the citizen shall not claim its aid, because it is a sovereign act.
 
 
 90
 When government enters into contracts with individuals, it parts with its sovereignty. 9 Wheat. 907. In the case of the United States vs. Barker, the government was held bound in all proceedings upon bills of exchange to adhere to the same rules as govern individuals.
 
 
 91
 According to the general principles of the law of nations, the act of cession would not have impaired individual rights. But the peculiar provisions of the act of cession give this principle additional sanction; all the right of the United States to land here, depends exclusively upon the compacts made with individuals.
 
 
 92
 It is then immaterial whether it holds its powers and property in trust for the community or not. The question is, what is the extent of its property, and its rights to that property; and this cannot be affected by the inquiry for whose benefit they are holden. They cannot be enlarged or diminished by the circumstance that they are held by a sovereign power for the general good.
 
 
 93
 If the appellants are right in their view of the nature of the estate existing in the premises; if this was a charity, and the object of the donation was the public; congress, representing that public, may renounce this beneficial interest. If it is a trust, and the public are the cestui que trust; congress representing them may relinquish all the advantages secured to the community. If it is a dedication to the public; congress may discharge the estate of this servitude or easement.
 
 
 94
 While it is conceded that congress, in the exercise of their power over the public property, are absolute, and are responsible only to the nation; the legal effect or operation of such renunciation is wholly disconnected with any question of sovereignty.
 
 
 95
 It is objected that the original proprietors have been paid a full price for the lands in controversy. It is not considered as of any moment how this fact was. In determining what was conveyed, what estate did pass; the question of what was paid for it is an immaterial one. The party was paid for what he conveyed; he received his compensation for what he granted; but the question still recurs, what did pass by the conveyance. No court can enlarge or diminish the effect of the granting part of a deed by referring to the amount of consideration, and deducing from that any rule of interpretation.
 
 
 96
 It is also insisted, that the beneficial purposes to which the proceeds of these sales are applicable, are fatal to this claim. These can have no effect upon the question really involved in this case. However judicious the appropriation of the proceeds arising from a violated trust, it will not influence the inquiry whether it was violated.
 
 
 97
 As to the suggestion that the remedy of the appellants was at law, and not in equity; it is answered, that the act of congress furnishes the specific remedy by bill, in the nature of a petition of right; and if the case presents a trust, it is peculiarly within the guardianship of a court of chancery.
 
 
 98
 Whether there is in this proceeding a misjoinder of parties will depend upon the result of the case. The corporation of Washington, acting under the act of congress, sells the land, and receives and applies the proceeds. If an account is to be directed, it is the only party which can furnish one.
 
 
 99
 It is also submitted, that the only effect of sustaining this objection would be a decree in favour of the corporation. The consequences of a misjoinder in chancery are very different from what they are at law, in an action ex contractu.
 
 
 100
 The parties, appellants, have a beneficial interest in the continued devotion of the property to public uses, which a court can notice. 4 Wheat. 630, 641, 697. The proprietors of every lot are interested in the size of the streets, and in their direction; in the situation of public squares, and in the location of public institutions and buildings.
 
 
 101
 The original proprietors are especially interested. 1. In diminishing the number of building lots thrown into market. 2. By the enhanced value of their remaining property, in consequence of its vicinity to a public square, or fronting on a commodious street.
 
 
 102
 Such was the intention of all the parties to the compacts and arrangements relative to the city of Washington; and this fully appears from all the circumstances of the case, as well as from the language employed.
 
 
 103
 The act of congress of July 1790, the only act passed before the execution of the instruments, did not authorise the purchase or acceptance of property in general, and without limit. The third section authorises, the commissioners to purchase or accept such quantity of land within the district, as the president might deem proper for the use of the United States. The fourth section empowers the president to accept grants of money to defray the expenses of such purchases, and of erecting the necessary buildings. There is nothing in this act relating to the city, or the plan of the city, to public streets, or to reservations for city objects.
 
 
 104
 No authority is given even relative to the building lots, considered as real estate conveyed to the government. The building lots never were conveyed to the United States. They were granted to trustees, a moiety of them to be regranted to the proprietors, and the residue to be sold: and after deducting so much from the proceeds as would pay the former proprietor twenty-five pounds per acre, the residue was to go to the United States, as a donation in money; the objects to which the money was to be appropriated being specifically designated.
 
 
 105
 The act of the legislature of Maryland of 1791 conforms to this view of the case.
 
 
 106
 The president and the commissioners are by the act of congress invested with special powers, which they cannot transcend; and it appears that either the estate conveyed must be strictly in accordance with those powers, or that the instruments of conveyance are void. The authority is vested in them in affirmative words, and this is equivalent to a negation of any other authority. 2 P. Wms, 207.
 
 
 107
 A review of the various acts of congress passed subsequently, shows that the government never contemplated that the contract was susceptible of the interpretation now the subject of complaint. Mr Coxe here cited and commented on the acts of May 6, 1796, April 18, 1798, April 24, 1800, January 12, 1809, and July 5, 1812: and contended, that these various legislative acts conclusively settled the interpretation of the contract, and showed that the signification attached to the phrase, 'use of the United States,' was synonymous with 'public purposes,' and other similar forms of expression. A resolution of congress in the session of 1804 is to the same effect.
 
 
 108
 But the government has in fact paid nothing for these lands. The various instruments between the parties, and the various acts of congress already cited, show that each proprietor whose lands were appropriated to public purposes was to recover the compensation of twenty-five pounds per acre, out of the proceeds of the building lots selected on his own tract. No other fund was pledged, and this was the practical construction placed upon the compact by the commissioners.
 
 
 109
 Mr Wirt, and Mr Jones, argued the case for the corporation of the city of Washington.
 
 
 110
 Mr Wirt contended, that there was but one aspect in which the bill of the appellants presents a case which is within the jurisdiction of the court. It is that in which it asks a partition of the proceeds of the sales of the lots. The only substantial defendant is the United States, and the United States being a sovereign, cannot be sued.
 
 
 111
 It is said that the act of congress of 1822 dispenses with this sovereignty, and permits this suit. This is true, so far as the act does dispense with the sovereignty, but no further. The terms of the law are to be carefully observed. The dispensation is a limited one. It permits a suit for the proceeds; and the court cannot assume jurisdiction beyond this point. So much of the bill, therefore, as seeks to enjoin the United States from letting lots, or asks for a decree for the land specifically, is coram non judice.
 
 
 112
 It did not require a plea to raise this question of jurisdiction; for the want of jurisdiction is apparent on the bill. On the face of the bill, the court will see that the United States is the only material defendant; and the bill refers expressly to the act of 1822, as the authority for the proceedings. That act thus becomes a part of the bill; it authorises a suit for no other purpose, and to no other extent, than to ascertain whether the defendants be entitled to any part of the proceeds.
 
 
 113
 As to dismissing the bill against the United States, and retaining it against the corporation. Can this be done? The act of 1822 declares, that the proceedings shall be conducted according to the principles of equity; and can a court of equity proceed to a decree in the absence of a material party?
 
 
 114
 But it is clear, that the corporation is merely the organ of the government under the act of 1822; and thus a limited agency, confined to the selling of the lots, and applying the proceeds under the sale, is in the corporation. Can the agent of a sovereign be sued for the purpose of stripping the sovereign of his rights of property.
 
 
 115
 Again, what decree could be rendered against the corporation? Could there be a decree for this property? The corporation has no right of property. It is not even an agent of the government to defend the property in a judicial proceeding; its agency being limited to the special ministerial acts designated by the law of 1822.
 
 
 116
 Under what principles then which regulate the proceedings of courts of equity, could a decree for this property pass against the corporation of the city of Washington? Of what avail would such a decree be against the United States? Decrees bind those only who are parties and privies; and if the bill be dismissed against the United States for want of jurisdiction, in what sense could they be said to be parties or privies to the suit which would remain against the corporation? The corporation claim no rights of property, and are entrusted with no agency to defend this suit; they are the mere servants of the government in performing the ministerial acts presented by the law of 1822.
 
 
 117
 We might well insist that the whole bill should be dismissed, as not conforming in its character to the only bill permitted by the law to be settled by the appellants. But it is the interest of all parties that this controversy shall be terminated.
 
 
 118
 There is, it is repeated, but a single aspect in which this case can be regularly presented; it is that it shall be considered a bill in the nature of a partition of right, claiming the proceeds of the sales.
 
 
 119
 In deciding this question the court must necessarily decide, incidentally, on the title of the complainants to the property. If they have a right to half the proceeds, it can only be because, on some principle of law or equity, they show title to half the property.
 
 
 120
 2. Are the complainants entitled to the proceeds or to any portion of them? This must depend upon the contract under which the original proprietor parted with the property and conveyed it to the United States.
 
 
 121
 If he parted with the property sub modo; if there was any condition in the contract that it should be applied to a specific use, and that, if not so applied, it should return to the original owner, or to his heirs: then, if it has not been so applied, the claimants are entitled to the proceeds. But if the conveyance to the United States was absolute, and for a good and full consideration, and the indication of the use was referred by the terms of the contract to the pleasure of the United States; then it must be manifest that the complainants are not so entitled.
 
 
 122
 It would seem, that the opinion that the complainants are entitled to some part of these proceeds, has arisen from confounding the case with others reported in the books, to which it bears no just resemblance; but from which it is distinguished by circumstances which withdraw it entirely from the influence of those decisions.
 
 
 123
 Thus, cases are cited of charities, which are free gifts of property, dedicated on the face of the instrument itself, which made the gift to a special use,—free gifts, in which the donor had been induced to make them by no pecuniary interest, but which proceeded solely from his disinterested bounty and charity.
 
 
 124
 But these reservations were not free gifts. They were sales founded on a most valuable consideration, in which the vendor had most important pecuniary interest at stake; and this consideration was of a twofold character. 1. The establishment of the federal city on their lands, which has made the desert smile. 2. The direct consideration of twenty-five pounds paid for every acre of these reservations.
 
 
 125
 The cases of charities have therefore no application; because these were not gifts, but purchases. They have no application; because here there was no dedication on the face of the instrument to any specific use, but that was left open and was placed solely at the pleasure of the United States.
 
 
 126
 Nor is there any trust, express or implied, raised on the face of the contract, in behalf of the original proprietors, nor any use for them; the whole trust and use being for the benefit of the United States.
 
 
 127
 Neither is there seen in the case a single feature which brings it in any degree within the range of those cases which have been cited of estates granted on condition, or of cases of determinable fees. For here is no condition annexed to the grant, unless it may be regarded as a condition that the property is to be applied to the use of the United States; a condition, in the due performance of which the original proprietor had no other interest than any other citizen of the United States. Nor is there any thing which makes this a defeasible or determinable fee; because the fee is in perpetuity to the United States.
 
 
 128
 The argument on the other side proceeds entirely on these two propositions. 1. That this was a free gift of property on the part of Mr Burns. 2. That it was a gift for a specific purpose; and that this specific purpose having been entirely given up, Mr Burns, or his representatives, are entitled to a return of the property.
 
 
 129
 Now, on the other hand, if it appears; 1. That this is not a free gift, but a sale for a valuable consideration, which has been received by the grantor; on this single ground, then, there must be an end of this claim.
 
 
 130
 2. If it shall farther appear that it was not even a sale for a specific use, but for the use generally of the United States, there must be an end to all pretension of claim. And the truth of these latter propositions will result from an inspection of the contract, and a steady look at the real character of the case; and at the circumstances out of which the contract grew, and with relation to which it is to be construed.
 
 
 131
 This was not a gift, but a sale for a valuable consideration which has been paid, and this consideration was two fold. 1. The establishment of a federal city on these lands. 2. The receipt of twenty-five pounds per acre for the reservation.
 
 
 132
 The establishment of a federal city on the lands. This feature alone distinguishes this case from all others which have been cited from the English or American books.
 
 
 133
 Was not this a valuable consideration? not an empty, speculative, imaginary consideration, but one real and solid; one which suddenly converted these exhausted and unproductive tobacco fields into mines of almost countless opulence.
 
 
 134
 The value which was given to the property of former owners, is fully shown by the history of the period when the location of the federal city was about to be made. It was in the power of the president to fix the site of the city where he should decide. He could have put it where it now is, or have gone to Georgetown, and there erected the public buildings.
 
 
 135
 Every public body, and every private individual who in those days touched this subject, has left us proofs of the interest which the land holders were expected to take and did take in the important question of the precise location of the city; and have thereby borne testimony of the reality and value of the consideration. Act of congress of the 16th of July 1790. Burch's Dig. 226. Act of the legislature of Maryland of the 19th of December 1791.
 
 
 136
 Suppose the whole of the land on which the city stands had been purchased by the United States before the location of the city, and paid for by twenty-five pounds per acre out of the public treasury, and such a deed had been taken as that which has been executed, a conveyance in trust to the United States; could the vendor have any colour of right to restrict the United States as to any use of the property thus purchased.
 
 
 137
 Suppose the property had been condemned by inquisition under the law of Maryland, to the use of the city of Washington; could it possibly be contended that the former proprietor would retain any control over the property, or its application, the land being paid for out of the public treasury. Now, if it be true that if the property is paid for by the United States, either by voluntary contract, or by writ of ad quod damnum, the former proprietor would cease to have any control over it; what is there in the mode of payment which was adopted, and the benefits which he received, to vary the rights of the parties?
 
 
 138
 It is urged that as the payment was made out of the funds of the ancester of the complainants, the reservations were virtually free gifts. Now, there was nothing in the case which deserves the name of a free gift; for the establishment of the city was a consideration which produced the whole increased value of the property.
 
 
 139
 By the parties themselves it was never pretended that these reservations were a gift on the face of the deed itself; they are treated as bargained and sold to the use of the United States; and nothing is pretended to be a donation, except so much as shall remain of the proceeds of the sales of the alternate lots, after the payments for the reservations have been made.
 
 
 140
 But suppose that the money which was produced by the sales of the lots and was paid for the reservations, is to be considered as a gift of money by the original proprietors; is not money so given as absolutely the property of the United States as if it had been raised by a tax? That such gifts would be made was anticipated by congress, gifts in consideration of the establishment of the city on the lands of the proprietors.
 
 
 141
 But it is said, that the proceeds of those lots were a gift of money for a limited purpose; that is, for the purpose of its being applied to pay for these reservations, at the rate of twenty-five pounds per acre; and these were to be purchased for a specific use, from which the United States have departed by the act of 1822. Such is not the agreement; nor the deed which was to give effect to the agreement. The agreement is to be taken all together, not distributively.
 
 
 142
 Mr Berrien, attorney general, for the United States, stated, that by the act of congress of 1822, it was made his official duty to represent the interests of the United States in this case.
 
 
 143
 The act authorises the circuit court to entertain jurisdiction of a bill in equity in the nature of a petition of right against the United States; to hear and determine upon the claim of the appellants; and to determine what proportion, if any, of the money arising from the sale directed by the act they are entitled to. The purpose of the government in passing the law is fulfilled by meeting the claim on its merits.
 
 
 144
 The bill states that the United States had no right, without the consent of the complainants, to dispose of the lands directed to be sold by the law: that such a disposition of them determines the trusts and revests the property in the original proprietors, or their representatives; or that at their option the trusts originally declared, attach to the property so transferred, or to the proceeds arising from the sale.
 
 
 145
 It is not necessary in this proceeding to consider the question of forfeiture. If such an effect was produced by the act of 1822, the complainants have their remedy against the purchasers under the act. They have, however, relinquished that ground; and they seek relief against the United States under the special provisions of the law; thus affirming the sale and seeking a dividend of the proceeds of the sale.
 
 
 146
 But in any view of the case the circuit court had no jurisdiction to hear and determine such a claim; and the only question presented for the consideration of this court, and which was properly before the court below, is, whether the complainants, coming in, and assenting to the appropriation of the lands made by the act of 1822, are entitled to a moiety of the proceeds of the sales.
 
 
 147
 These propositions are maintained on the part of the United States. 1. The legal effect of the conveyance from David Burns to Thomas Beall, of George and John M. Gantt, and by the latter to the commissioners of Washington, was to divest David Burns and his heirs of all right, title, and interest in the several squares or parcels of land selected for the use of the United States.
 
 
 148
 2. The deed from David Burns to Thomas Beall and John M. Gantt conveyed the legal estate of David Burns to all the lands held by him within the limits of the contemplated city, to those persons, 'to have and to hold,' to them and the survivor of them, and the heirs of such survivor for ever, on certain special trusts: among which were the following, to convey to the commissioners of Washington, &c. and their successors, to the use of the United States for ever, and for the consideration of twenty-five pounds per acre, the lands which are the subject of this controversy; all which they covenanted to do.
 
 
 149
 In the execution of this trust, and in the fulfilment of their covenant, Thomas Beall and John M. Gantt did convey to the commissioners. The legal title to the lands then became vested in the commissioners, in trust, to hold that portion of them which is now in controversy, for the use of the United States.
 
 
 150
 In equity the title became absolutely vested in the United States. 1 Eden, 226. For the limitations of trusts are to be construed the same as those of legal estates. 8 Com. Dig. 1006.
 
 
 151
 It was in the eye of equity a grant to the United States for ever. Such a grant vests the fee. A grant to the king in perpetuum gives him a fee, without the words heirs or successors; for he never dies. So also is the law as to a grant to a corporation aggregate. 4 Com. Dig. 12. 2 Bac. Ab. 536.
 
 
 152
 If this were not so, the continuance of any right, title, or interest in David Burns or his heirs, was inconsistent with the authority under which the purchase was made; which being special, created by a public law, and therefore known to the vendor, the conveyances given and received must be construed in reference to it. The act of congress under which the purchase was made is to be taken as part of the contract.
 
 
 153
 The commissioners were authorised to purchase or accept lands within the district for the use of the United States; they were moreover authorised to accept grants of money. Under this latter authority they entered into a contract between the United States and the original proprietors for the division of those building lots.
 
 
 154
 But it was in the execution of their power to purchase, for the use of the United States, that they did purchase the reservations selected by the president, and paid for them at the rate of twenty-five pounds per acre.
 
 
 155
 These they were required to purchase for the use of the United States,—for their sole use. They were not authorised in relation to these lands to admit any community of interest. They had simply the power to purchase or accept; but in either case, for the use of the United States; not for the joint use of the United States, and any other persons. The preliminary agreement expressly negatives the idea of such joint use or joint property in the United States and the former proprietors.
 
 
 156
 It was a power to purchase for the use of the United States generally, without a specification of the purposes to which the land should be applied, or any limitation whatever upon the direct and absolute dominion which the United States were to acquire by the purchase.
 
 
 157
 Would an express stipulation that the United States should hold these squares in perpetuity, as such, without power to appropriate them to any purpose, have been pursuant to the authority under which the commissioners acted? They were authorised and directed to purchase such lands as the president should deem proper for the use of the United States. Can such a stipulation be implied from a grant to the use of the United States? But if it could, the implication must be extended further. From a grant to the use of the United States without qualification, absolutely, and for ever; you must imply, 1. That the United States must be for ever restrained in the use of the thing granted to the specific purpose to which it was applied at the date of the grant. 2. That a breach of this condition would raise a new trust for the benefit of the United States and the original proprietors or their representatives. It would not operate as a forfeiture; but it would raise a new trust for the joint benefit of the parties, absolute in its terms.
 
 
 158
 From a grant to the United States, a condition is implied, and then a breach of that condition; which, however, does not operate a forfeiture, but serves as the basis of a new trust, to be raised by implication for the joint benefit of the United States and the original proprietors.
 
 
 159
 3. Construing the contract according to its plain import and intent, there is no equity in the complainants' claim.
 
 
 160
 The proprietors conveyed to Beall and Gantt certain lands, which were to be laid out as a city, with such streets or squares, parcels or lots, as the president of the United States should approve, on certain trusts. 1. To convey to the commissioners of the city of Washington, and their successors, for the use of the United States, for ever; all the streets, and such of the squares, parcels, and lots, as the president should deem proper for the use of the United States. 2. Of the residue of the lots, one half were to be reconveyed to the original proprietors. 3. The other moiety was to be sold under the direction of the president; and the proceeds, after paying twenty-five pounds per acre for the lots, squares, and parcels taken for the use of the United States, were to be paid over to the president as a grant of money to be applied for purposes, and according to the act of congress 'for establishing the temporary and permanent seat of government of the United States.'
 
 
 161
 The result of this was, that the land conveyed, or so much of it as was necessary, being laid out in a city, the United States were to take to their own separate use, for ever, such squares, parcels or lots as the president should prefer, and to pay therefor twenty-five pounds per acre; the remaining lots to be divided between the United States and the original proprietors. The streets were of course given up without compensation. One moiety of the remaining lots, and any lands not included in the city, to be conveyed to the original proprietors; the other moiety to be sold as has been stated.
 
 
 162
 The appellants pretend that the lots and parcels taken for the use of the United States, and paid for at the rate of twenty-five pounds per acre, must be retained as squares, or as the sites of public buildings, or for other public works; and cannot be sold to individuals for building lots, without entitling the appellants to a moiety of the purchase money.
 
 
 163
 It is contended that there is no equity in this claim. 1. Because excluding the adscititious value given to the property of the original proprietors by the location of the city as the seat of government, a full price was paid by government for the land. 2. As against the United States the proprietors have no right to make any claim, on account of this factitious value. 3. Independently of the consideration paid per acre for the lands appropriated to the United States, the proprietors by the sale of the moiety of the building lots, which were reconveyed to them, were liberally compensated for their property. 4. It was expressly denied in the answer, and no contradictory testimony is offered, that the lands reserved from sale and appropriated to the use of the United States, were so reserved to be appropriated, or under a pledge to appropriate them to any specific purpose whatever, except the sites of the capitol and president's house. 5. No such pledge was necessary to secure to the original proprietors an advantageous sale of the moiety of the lots reserved to them; for the interests of the United States concurred in not overstocking the market, as they were entitled to the proceeds of the sales of the other moiety. 6. Such a pledge would have been much more strongly implied in behalf of the purchasers, or individual lot holders, the value of whose acquisitions might be affected in various ways by laying off the reservations into building lots.
 
 
 164
 But both and all claims must yield to the right of the United States, to dispose as congress may think proper, of that to which an unconditional title had been acquired; and the interests of all were secured by the consideration that the government had a deeper interest than any individual could have in the prosperity of the city.
 
 
 165
 7. It was a fund reserved for the future improvements of the city. Improvements would be required, and the quantity reserved proves that this was the object of the reservation.
 
 
 166
 The attorney general then went into an examination of the practice which had prevailed under the acts of congress, in relation to the city of Washington; and contended that it had been in accordance with the views of the United States, as now represented by him. He denied, that on any occasion, a construction different from that which he had given to the contract with the proprietors, and to the laws relative to the city, had ever been assented to by the government, or by their officers.
 
 
 167
 Mr Taney, for the appellants, in reply, contended; that whatever rights congress or the government had in the property within the city of Washington, depended on the contract with the original proprietors, and not on their rights of sovereignty. The act of Maryland of 1791 is the act which was accepted by congress; and all the rights of sovereignty which can be exercised are derived from that act. They cannot be greater than those which were possessed by the former sovereign who granted them. If the United States accepted a cession with limited powers of sovereignty, they are bound by the limitations. They might have refused the terms; but having accepted them, they are bound by them.
 
 
 168
 The constitution of the United States declares that congress shall have exclusive legislation; but it does not require that the power shall be despotic or unlimited. It merely excludes the states from all interfering legislation.
 
 
 169
 The act of 1791, sect. 2, passed by Maryland, limits the power of congress, and declares that the cession shall give them no other right in the land than may be transferred by the individuals. All the rights therefore which the United States had or have in the soil in the district must have been acquired by contract. They can acquire none by the exercise of sovereign power; for they have surrendered that portion of sovereignty in this district, by accepting it upon the terms stated.
 
 
 170
 Deriving their rights from contract with the proprietors; under no provision in the same, nor under the act of cession, could they condemn the land for public uses; for that would not be a transfer from the proprietor, but would be to acquire it without a transfer from him, and by a mere act of sovereign power.
 
 
 171
 If, however, the sovereignty of congress is not limited by the cession, yet the exercise of despotic power on this subject is restrained by the constitution; and if the law of 1822 was intended to seize on the private property of individuals, and dispose of it for public profit, merely for public gain, it would be contrary to the letter and spirit of the constitution, and be void. For if they may take it for such a purpose, they must give the owner of it a fair compensation; and they have no right to fix that compensation at what they may sell it for.
 
 
 172
 But the seizure of the property of an individual, merely to sell it to another to raise money for any purpose, can hardly be supposed to be authorised by any principles of a free government, and is in manifest opposition to the spirit of the amendment of the constitution. 2 Dall. 314.
 
 
 173
 But the act of 1822 has no such object. It proposes to sell the right of the United States, and no more. It has no terms to divest the right of the individual owners, and obviously has no such design. It submits these rights to judicial decision, to be tried by the principles of a court of equity. In submitting to such a trial and decision, they place themselves on the ground of contract, and waive any rights their sovereignty might give. For it would be absurd, indeed, to suppose that the United States gave to the court the mere power of hearing a cause, when that hearing could produce no judicial result.
 
 
 174
 If congress by mere despotic power might seize and sell this property, without compensation to the owner, and if their will be the only principle of equity by which it is to be decided; then all this controversy authorised by law is nugatory. For in that case we have lost the land by seizure; and we are not entitled to payment for it, unless they will it, and as they do not will it in the law, we are sent to this highest tribunal to show rights which have no existence, as they have been extinguished by the despotic power of the sovereignty.
 
 
 175
 The whole frame of the act of congress shows that such is not the meaning of the law. The court are to decide according to the principles of equity; and what the equity may be depends on contract express or implied. The government stands before this tribunal as a suitor; having the same rights, and subject to the same rules as an individual.
 
 
 176
 Assuming the questions in the case to depend on contract;
 
 
 177
 The agreement between the United States and the proprietors was entered into on the 12th of April 1791. The deed of conveyance was executed in July 1791. Before this agreement the site of the city was fixed.
 
 
 178
 There was no contract as to the location of the city with the proprietors. Every thing had been done independently of the proprietors, and without their consent. The agreement was among the proprietors themselves; neither the commissioners nor the president are parties to it. It does not purport to be entered into in consideration of the fixing of the city here, that was done; but, expecting immense advantages, they were willing to make liberal return.
 
 
 179
 The government are not therefore purchasers for this consideration. It was merely voluntary on both sides; both parties derived advantages, but not by the contract with one another; and if there was no contract, there was no purchase.
 
 
 180
 Neither does the twenty-five pounds per acre paid for the public ground constitute them purchasers. The agreement and the deed must be taken together. The United States were not the founders of the city, but the proprietors. The president was authorised by the United States to fix on this site for the seat of the government; and to accept such quantity of land as he should deem proper, for the use of the United States. In the plan of the city, and in the regulation of the streets, he was the agent of the proprietors, not of the United States. Such was the opinion of Mr. Breckenridge, attorney general of the United States. Burch's Dig. 337. Squares, public walks, and grounds for gardens, were reserved; not necessary and proper for the use of the United States.
 
 
 181
 The deed executed by the proprietors conveyed the land absolutely and unconditionally, and without the payment of any consideration. Nothing is required in return; nothing is reserved for the land dedicated to the use of the United States, unless it shall be obtained from the sales of the lots to be disposed of under the contract. This is a deduction from the donation of the proprietors. Thus the squares cost the United States nothing.
 
 
 182
 Had the whole of the land of any of the proprietors been laid out in squares, he would have received nothing for the same. The act of 1791 confirms this construction of the contract, and was accepted by congress.
 
 
 183
 These being the provisions in the deed, the next question is, what is the construction of the instruments by which these contracts were made? Was the absolute and unqualified use given or conveyed; or was the use for public purposes, as distinguished from private property?
 
 
 184
 And this question mainly depends on another. What was the character of the estate conveyed to Beall and Gantt? If it was a conveyance under the statute of uses, or was an executed trust, the words must receive a technical construction. If an executory trust, it is otherwise. If it is such, is it to be construed by the principles applicable to such contracts? Preston on Estates, 186, 187. Fearne, 136, 137. No act of the trustees can change the character of the trust or the rule of construction.
 
 
 185
 If Beall and Gantt have conveyed a different estate from the one authorised, the conveyance gives no title beyond the trust. And the case is now to be considered, as if the court of chancery were, in the absence of any conveyance, called on to direct the proper deeds. It is to be executed now as it would have been the day after the contract was made; lapse of time has not altered its meaning.
 
 
 186
 Suppose chancery so called on, what would be the stipulations directed in the deed? The objects in view are manifest.
 
 
 187
 Suppose the government should have abandoned Washington, and fixed itself elsewhere; would they have been allowed to sell the squares? Suppose they abandon it in part instead of the whole, does it alter the principle?
 
 
 188
 Upon the point that this was an executory trust, Mr Taney argued; that the conveyance to the trustees, Beall and Gantt, and by them to the commissioners, did not vest the legal title to the public squares in the United States, but created a trust for their benefit. The trust being an executory trust, is to be carried into execution according to the intent of the party who created the trust. Fearne, 124, 136, 137. Preston on Estates, 187, 188.
 
 
 189
 The deed from Mr Burns is not therefore to be construed by technical rules, nor the words of it taken according to their strict legal interpretation; if such a construction appears from the whole case to be contrary to the intention of the grantor.
 
 
 190
 The United States are not asserting a legal title in directing the squares to be sold. They are exercising a power as cestuis que trust over a trust fund; and the extent of their right in the fund they have submitted to judicial decision. And although the words in the deed of Mr Burns might, in a conveyance of the legal estate under the statute, be held to pass the absolute and unqualified use in the squares; yet in the interpretation of a trust the court will look to the real intention of the parties, and are not bound by the strict legal meaning of any particular words used in the instrument.
 
 
 191
 The United States have no rights except by transfer from individuals. Act of 1791, sec. 3. In submitting the right to judicial decision, they subject themselves to the rules which govern contracts with individuals.
 
 
 192
 Expounding the deed of Mr Burns on these principles, it may be safely assumed, that he intended to authorise Beall and Gantt to convey to the commissioners the squares and streets, for the purposes authorised by the act which fixed on Washington as the seat of the government. He did not mean to authorise a conveyance for any other purpose, nor of any greater estate than the United States desired; for his deed refers to and recites the title of the law of congress.
 
 
 193
 The question then is, did the law propose to purchase or accept as a donation the absolute and unqualified interest in the land? or to obtain it for special purposes, and for certain specified uses?
 
 
 194
 The first proposition supposes that congress looked forward to a speculation in the land, and expected to gain by the rise of property. This could not have been; and such a presumption is negatived by the terms of the acts of congress.
 
 
 195
 These different acts of congress have expounded the meaning of the words, 'proper for the use of the United States' in the act of 1790; and show for what purposes the president was authorised to accept or purchase land. His authority to accept or purchase land being a special one, and for special purposes, he could not accept or purchase for any other purpose; and if he did, the grant would be void. He might accept donations of money, but not of land.
 
 
 196
 But the proprietor obviously intended to convey for the purposes mentioned in the law, and none other.
 
 
 197
 This is shown by the argument, proposed March 1791; accepted, April 1791; and by the deed of June 29, 1791. The deed refers to the act of congress, recites its title, and uses the words of the law. Streets are associated with squares, and to be conveyed to the use of the United States.
 
 
 198
 This being an executory trust, 'the court may ascertain the meaning of the grantor,' from the nature of the contract and the object of the provision. 1 Prest. 187.
 
 
 199
 The object of the proprietor would not have been to allow the president to select all or any of the building lots at this price. He was to be paid out of the sales of the lots. There might not have been lots enough to pay him. Such an intention would have been the surrender of his whole property, without compensation and without motive.
 
 
 200
 The contract then and now means the same thing; and if such a use of the power of selection, by the president, would have been at that time contrary to the intention of the grantor, it is equally so now.
 
 
 201
 Yet we are now inquiring what was the intention of the grantor; and being a trust executory, it is to be executed according to that intention.
 
 
 202
 It is said that the United States paid its full value. There is no proof of that fact; and the fact is otherwise.
 
 
 203
 The consideration on which the squares were sold for twenty-five pounds, was, that the erection of the public buildings, and the laying out of public walks, &c. would render the city a more agreeable and desirable place of residence, and enhance the price of the lots retained by the proprietor. If he was to retain no lots, or only the refuse lots, it does not by any means follow that he would have taken the twenty-five pounds.
 
 
 204
 The very case on trial proves that such could not have been the intention of the proprietor. His lots no longer front on a magnificent square. He is cut off from the most public avenue in the city.
 
 
 205
 The United States are in no sense of the words purchasers. The public squares are in truth, as has been stated, donations from the proprietors.
 
 
 206
 But if considered as purchasers, they yet purchase for a specific purpose, and having made the contract, they cannot depart from it. They cannot violate their contract. 5 Wheat. 642, 684, 695.
 
 
 207
 The grantor is entitled to the execution of his contract, whether he does or does not receive a consideration for it. And it matters not whether his contract is express or implied; whether by way of trust or in any other manner, as by mere dedication to public uses.
 
 
 208
 In the case of a road or street, the same interest passes to the public, and the same remains in the proprietor. Whether he is paid for it or not, no more passes than the party intended to grant. And if these squares were granted for specific public uses, and not to be converted into private property, that trust, whether created for a valuable consideration or not, must be executed according to the intention of the grantor.
 
 
 209
 The contract is one entire contract; and being executed in part, must be executed throughout. Being an executory trust, it must be executed according to the intention of the parties, whether made for a valuable consideration or not. Marriage is a valuable consideration, and is one class of the cases in which this principle is most commonly applied.
 
 
 210
 Suppose a chancery court now called on by the United States to compel the trustees to execute the legal conveyances, what would be the conditions and covenants? Would not the squares be made to revert to the grantor when the uses ceased?
 
 
 211
 The lots were pure donations; and equity would not extend the gift farther than the contract. It did not extend to squares.
 
 
 212
 Assuming that the public squares were granted for specific public purposes, as has been stated, the United States were the cestuis que trust for such purposes, and none others. The United States had a right to erect public buildings on them, and to make them public walks or gardens; they were so far cestuis que trust; they were not trustees for others.
 
 
 213
 As this was a trust for the benefit of the United States, they had a right to renounce it.
 
 
 214
 The proprietors could not compel them to erect the public edifices, or to lay out and ornament the public grounds. They had not bound themselves by contract to do so; they might or might not do it at their pleasure. And they might renounce the trust intended for their benefit, and the trust would then end; it would be extinguished.
 
 
 215
 The act of 1822 is a renunciation of the trust. They, the cestuis que trust, declare that they will not use it for the specific purposes for which it was conveyed. It is not a forfeiture. It is admitted that a trust is not forfeited by its abuse; it is not claimed as a forfeiture; but having renounced it, the trust, in their favour, by directing it to be converted into private property; to whom does the property belong? It goes to the heirs of the grantor. 4 Ves. 60. 9 Ves. 399. 5 Har. & Johns. 400. 4 Wheat. 39. Append. 15.
 
 
 216
 If the power exists any where, either in congress or elsewhere, to convert these squares into building lots and private property, under the provisions of the original agreement and deed; then, as soon as that power is exercised and the property so converted, the provisions and stipulations of that agreement attach upon it, and the original proprietor is entitled to the one half: for whether the power given to lay off the building lots was exercised sooner or later, can make no difference.
 
 
 217
 If under the agreement and deed the power can be rightfully exercised, the consequence of that exercise of power must follow; and the original proprietor is entitled to one half of the lots so laid off, under and by virtue of his agreement. The act of 1822 is obviously framed on this interpretation of the contract. It directs the corporation to sell the right of the United States, and then provides for a decision on these rights.
 
 
 218
 Congress obviously supposed, when passing the law, that the United States had a right in these lots. And if they had the power to convert the squares into private property under the original agreement and trust, then they would have been tenants in common with the proprietor, and entitled to sell the half and receive the proceeds.
 
 
 219
 Upon the whole, if the United States had only the right to use these squares for specified purposes, and no right to change the use; if they were merely cestuis que trust; they have renounced the trust, and the whole belongs to the original proprietors; it reverts to the donor or grantor.
 
 
 220
 If, on the contrary, they have the right to change the plan of the city and convert the squares into building lots, then, whenever this is done by a competent authority, acting under the contract, the proprietors are entitled to a conveyance of one half of the lots.
 
 
 221
 The relief: In either view of the case the relief is complete against the corporation.
 
 
 222
 If the United States could not sell the half, or could not sell the whole, they could give no right to the corporation to do so; and we were entitled to a perpetual injunction against them. 9 Wheat. 739.
 
 
 223
 If the law of congress does not authorise the court to decree against the United States as to the land itself, but only as to the money received on sale, then the bill may be dismissed against them; and a perpetual injunction decreed against the corporation.
 
 
 224
 The great object is to have the rights of the parties adjusted, and no doubt can be entertained that congress will faithfully carry into execution the principles settled by this court.
 
 
 225
 But the law of congress gives the court power to decree against the United States as to the land as well as the money. The act of 1822, sec. 6, authorises the party to set out in his bill his title to the land. His bill, therefore, brings that question directly before the court for decision, and imposes upon them the duty of deciding it; and if they must decide it, it follows that they must give the appropriate relief. And if the court come to the conclusion that congress had no right to sell the land, they can have no right to compel the party to accept money in lieu of it.
 
 
 226
 The eighth section of the act is only an enlargement of the power of the court. The proprietors might have assented to the sale, and offered to ratify it and accept the proceeds.
 
 
 227
 The law of 1822 provided for this contingency, in the eighth section. It enabled the court to dispose, finally, of the case, in whatever shape it should be presented to them.
 
 
 228
 Finally, it is a question between the government and an individual, on a subject of the most interesting character. How far may the government, by a new act of legislation, deprive him of his rights of property, and of the remedy to assert them? On such a question it may be assumed as certain, that the rights of the individual, whatever they may be, will be protected by this court. It is peculiarly one of those questions on which congress, with the best dispositions, are most liable to error. It is out of the usual scope of legislation. They cannot be expected to engage in minute investigation of titles. And they ought not to be held to have exercised wilfully a despotic power, even if they possess it, for the purpose of depriving a private citizen of a full and adequate remedy for the wrong done him.
 
 
 229
 The act of 1822 is in a very different spirit, and requires the rights of the parties to be decided by the terms of the contract, and not by power.
 
 
 230
 As to the forms of this proceeding, it is hardly necessary to discuss them. It is the great object of all parties to understand their rights, and that is the great purpose of the whole proceeding. Enough appears on the record to enable the court to decide on these. There does not appear, however, any well founded objection that can interfere with the relief we ask.
 
 
 231
 Mr Justice STORY delivered the opinion of the Court.
 
 
 232
 This is an appeal from the decree of the circuit court of the district of Columbia, sitting at Washington, upon a bill in equity, in which the appellants were original complainants.
 
 
 233
 On the 7th of May 1822 congress passed an act to authorise and empower the corporation of the city of Washington, in the district of Columbia, to drain the low grounds on and near the public reservations, and to improve and ornament certain parts of such reservations. By that act the corporation were among other things to change, by contract with the proprietors of the canal, the location of such parts of the canal passing through the city as lay between second and seventh streets, west, into such course as should most effectually, in their opinion, drain and dry the low ground lying on the borders of Tiber creek; and to effectuate this object, the corporation were further authorised; after having extended the public reservation designated on the plan of the city as number ten, so as the whole south side should bind on the line of Pennsylvania Avenue, and after having caused to be divided the said public reservation number ten, and also the public reservations numbers eleven and twelve into building lots; to sell and dispose of the right of the United States of, in and to, the said lots, or any number thereof, laid off as aforesaid, at public sale, &c. &c. And the corporation was further authorised to cause to be laid off, in such manner as the president should approve, two squares south of Pennsylvania Avenue, &c.; and also to lay off north of Maryland Avenue, two uniform and correspondent squares; and the said for squares, when so laid off, to divide into building lots; and to sell and dispose of the right of the United States in such lots, &c. &c. The proceeds of these sales were in the first place to be applied to the purposes above mentioned, and in the next place to inclosing, planting, or otherwise improving certain public reservations, and building certain bridges, &c. &c; and the surplus, if any, to go into the national treasury. The sixth section of the act then provides, 'that it shall be lawful for the legal representatives of any former proprietor of the land directed to be disposed of by this act, or persons lawfully claiming title under them, and they are hereby permitted and authorised, at any time within one year from the passing of this act, to institute a bill in equity, in the nature of a petition of right, against the United States, in the circuit court for the district of Columbia, in which they may set forth the grounds of their claim to the land in question.' The seventh section provides for the service of process upon, and the appearance of the attorney general, &c. The eighth section provides, 'that the said suit shall be conducted according to the rules of a court of equity. And the said court shall have full power and authority to hear and determine upon the claim of the plaintiff or plaintiffs, and what proportion, if any, of the money arising from the sale of the land hereby directed to be sold, the parties may be entitled to.' The ninth and last section of the act provides for an appeal to this court.
 
 
 234
 The plaintiffs filed their bill in the present case within the time prescribed by the act, making the United States and the corporation of the city of Washington parties. They claim title to the lands in controversy, which have been laid off into lots for sale, under David Burns, one of the original proprietors of the city, and of whom the plaintiff Marcia is the only daughter and heir. These lots embrace part of the reservations above referred to, and also a part of the street called B, according to the original plan of the city. The ground of the bill is, that by the original contract of the government with the proprietors, upon the laying out of the city, these reservations and streets were for ever to remain for public use, and were incapable, without the consent of the proprietors, of being otherwise appropriated or sold for private use; that the act of 1822, authorising such sale, is a violation of the contract; that by such sale or appropriation for private use, the right of the United States thereto was determined; or that the original proprietors reacquired a right to consider them in the same predicament as if originally laid out for building lots; or that, at all events, they were entitled, in equity, to the whole or a moiety of the proceeds of the sale, if the act of 1822 were valid for the purposes which it professed to have in view.
 
 
 235
 Some difficulty has arisen at the argument, from the peculiar structure of the bill; it professing in some parts to seek relief under the act of 1822, and in other parts insisting upon a title inconsistent with it; and demanding an injunction to prevent all sales of the land by the corporation. The opinion of this court certainly is, that under the act of 1822, the plaintiffs can proceed by a bill in equity in the nature of a petition of right against these the United States only for the money arising from the sales; and cannot claim a decree for the land itself, or for any injunction against sales of it.
 
 
 236
 The view, however, of the case which we are disposed to take, renders it unnecessary to consider whether the bill is so framed that with reference to the act of 1822 the court could pass a definitive decree against the United States upon it, from the incongruities alluded to.
 
 
 237
 As it is manifestly the interest and desire of all the parties to have an opinion upon the merits, so as to put an end to the controversy; we shall waive all consideration of minor objections, and proceed at once to the consideration of the substantial ground of the claim.
 
 
 238
 Congress, by an act passed on the 16th of July 1790, provided that a district of territory not exceeding ten miles square, to be located as therein directed, on the river Potomac, at some space between the mouths of the eastern branch and Conogocheague be, and the same was thereby accepted for the permanent seat of the government of the United States. Three commissioners were by the same act to be appointed, to survey, and by proper metes and bounds to define and limit the district; and they were authorised to purchase or accept such quantity of land on the eastern side of the said river, within the said district, as the president should deem proper for the use of the United States; and according to such plans as the president should approve, the commissioners were to provide suitable buildings for the accommodation of congress, and of the president, and for the public offices of the government of the United States. A subsequent act, passed on the 3d of March 1791, authorised some alterations of the limits of the district. Suitable cessions of the jurisdiction and soil of the territory, subject to the private rights of property of the inhabitants, were made by the states of Maryland and Virginia(a). And the former act further provided for the removal of the seat of government to the district on the first Monday of December 1800. The limits of the district were accordingly ascertained and defined; as made known by the proclamations of the president of the 24th of January and the 30th of March 1791.
 
 
 239
 As yet no public designation had been made of the site of the federal city, which was contemplated to be laid out within the limits of the district, nor of the places no which the public buildings should be erected; nor indeed had there been any purchase or donation from any of the proprietors of lands within the district, by or to the commissioners for that object. There cannot however be a question that various negotiations had been entered into with the proprietors, and informal proposals made by them with a view to obtain so important and valuable a boon as the location of the city within the boundaries of their estates. And it can admit of as little question, that preparatory steps had been taken on the part of the government, to procure suitable plans for the laying out of the metropolis.
 
 
 240
 In this state of things nineteen of the proprietors of the land constituting the present site of the city of Washington, among whom was David Burns, on the 30th of March 1791, entered into an agreement, which was presented to the
 
 
 
 (a)
 See acts of Maryland of the 23d of December 1788, 19th of December 1791, 23d of December 1792, and of the 28th of December 1793. Act of Virginia of the 3d of December 1789. commissioners as the basis of the terms on which they were willing to dedicate their lands for the location of the city. The agreement was accepted by the commissioners, and recorded in their books. It is in the following terms. 'We, the subscribers, in consideration of the great benefits we expect to derive from having the federal city laid off upon our lands, do hereby agree and bind ourselves, our heirs, executors, and administrators, to convey in trust to the president of the United States or commissioners, or such persons as he shall appoint, by good and sufficient deeds, in fee simple, the whole of our respective lands, which he may think proper to include within the lines of the federal city, for the purposes and on the conditions following. The president shall have the sole power of directing the federal city to be laid off in what manner he pleases. He may retain any number of squares he may think proper, for public improvements or other public uses; and the lots only which shall be laid off, shall be a joint property between the trustees in behalf of the public and each present proprietor. And the same shall be fairly and equally divided between the public and the individuals, as soon as may be after the city shall be laid off. For the streets, the proprietors shall receive no compensation; but for the squares or lands, in any form, which shall be taken for public buildings, or any kind of public improvements or uses, the proprietors, whose lands are taken, shall receive at the rate of twenty-five pounds per acre, to be paid by the public.' There are some minor arrangements as to growing timber, and grave yards, &c., which are not necessary to be mentioned. It is material, however, to observe, that no time or mode of payment is prescribed in the agreement of the twenty-five pounds per acre; and no fund out of which it was to be paid is designated. The agreement was merely preparatory, and to be carried into effect by formal conveyances.
 
 
 
 241
 Now, it is upon the terms of this agreement that the plaintiffs assert their title to relief in the present case. They contend, that though the whole land was to be conveyed, yet the portion of it which should be taken for streets and public reservations, according to the plan approved by the president, was clothed with a perpetual condition or trust that they should for ever remain streets and public reservations, and never should be liable to be appropriated to any private use; or changed from their original public purpose. That upon any such change or appropriation the title reverted to the original proprietors, or at all events, was to be disposed of and divided between them in the manner provided for, in respect to the land laid off into lots. They also contend, that the land so devoted to streets and public reservations, was a mere donation from the proprietors, and not a purchase by the United States; and therefore ought to be governed by the rules applicable to public charities, and the trust strictly construed and enforced.
 
 
 242
 It is not very material, in our opinion, to decide what was the technical character of the grants made to the government; whether they are to be deemed mere donations or purchases. The grants were made for the foundation of a federal city; and the public faith was necessarily pledged when the grants were accepted to found such city. The very agreement to found a city was of itself a most valuable consideration for these grants. It changed the nature and value of the property of the proprietors to an almost incalculable extent. The land was no longer to be devoted to mere agricultural purposes; but acquired the extraordinary value of city lots. In proportion to the success of the city would be the enhancement of this value; and it required scarcely any aid from the imagination to foresee, that this act of the government would soon convert the narrow income of farms into solid opulence. The proprietors so considered it. In this very agreement they state the motive of their proceedings, in a plain and intelligible manner. It is not a mere gratuitous donation from motives of generosity, or public spirit; but in consideration of the great benefits they expect to derive from having the federal city laid off upon their lands. For the streets they were to receive no compensation. Why? Because those streets would be of as much benefit to themselves, as lot holders, as to the public. They were to receive twenty-five pounds per acre for the public reservations; 'to be paid' (as the agreement states it) 'by the public.' They understood themselves then to receive payment from the public for the reservations. It makes no difference, that by the subsequent arrangements they were to receive this payment out of the sales of the lots which they had agreed to convey to the public, in consideration of the government's founding the city on their lands. It was still contemplated by them as a compensation; as a valuable consideration, fully adequate to the value of all their grants. It can, therefore, be treated in no other manner than as a bargain between themselves and the government, for what each deemed an adequate consideration. Neither considered it a case where all was benefit on one side, and all sacrifice on the other. It was, in no just sense, a case of charity; and was never so treated in the negotiations of the parties. But, as has been already said, it is not in our view material, whether it be considered as a donation or a purchase; for in each case it was for the foundation of a city.
 
 
 243
 And in construing this agreement, this fact should never be lost sight of. It is obvious, that the proprietors or their heirs could not be presumed for any great length of time to have any interest in the streets or public reservations beyond that of other inhabitants. If the city became populous, the lots would be sold and built upon, and in the lapse of one or two generations, at most, the title of the original proprietors might well be presumed to be extinguished by sales or otherwise; so that the interest of themselves or their heirs in the streets and reservations would not be distinguishable from that of other citizens. They must also have contemplated that a municipal corporation must soon be created to manage the concerns, and police, and public interests of the city; and that such a corporation would and ought to possess the ordinary powers for municipal purposes, which are usually confided to such corporate bodies. Among these are certainly the authority to widen or alter streets, and to manage, and in many instances to dispose of public property, or vary its appropriation.
 
 
 244
 They might, and indeed must, also have placed a just confidence in the government, that in founding the city, it would do no act which would obstruct its prosperity, or interfere with its great fundamental objects or interests. It could never be supposed that congress would seek to destroy what its own legislation had created and fostered into being.
 
 
 245
 On the other hand, it must have been as obvious, that as congress must for ever have an interest to protect and aid the city, it would for this very purpose be most impolitic and inconvenient to lay any obstructions to the most free exercise of its power over it. The city was designed to last in perpetuity: capitoli immobile saxum. No human foresight could take in the great variety of events which might render great changes in the plan, form, and locations of the city indispensable for the health, the comfort, and the prosperity of the city. Cases might easily be imagined, as in other cities, where the desolations of fire have made alterations in the streets and public squares of a city, most important and valuable to the whole community. A prohibition, which should for ever close up the legislative power of congress on such a subject, under all circumstances, ought not lightly to be presumed, nor readily admitted. It should be proved by the most direct and authentic documents, before we should admit the belief that the wisdom of the first president of the United States yielded up such a valuable franchise.
 
 
 246
 If the case had stood solely upon this preparatory agreement, as an executory contract, there might have been stronger grounds to impose limitations upon the grant of the streets and public reservations. The language of the instrument is, that the president may retain any number of squares he may think proper for public improvements, or other public uses. Yet even then, the appropriation of these squares for public uses would not necessarily carry with it an implied obligation that they should for ever remain dedicated to those uses, and to none other. If such had been the intention of the parties, we should naturally expect to find there some direct expression of it, some acknowledgement of the obligation, or some condition carrying it to such a political mortmain. If the stipulation was so important and valuable as is now contended for, and constituted an object of permanent solicitude, it would scarcely escape the notice of the proprietors in laying down the fundamental basis of their cessions. If it did then escape them, we should have reason to look for its incorporation into the more solemn instruments which were contemplated thereafter to be executed by the parties, and were in fact executed by them in fulfilment of their original agreement. But no such stipulation is there to be found.
 
 
 247
 On the 29th June 1791, the proprietors severally executed deeds of indenture to consummate the agreement of the preceding March. They are all in the same form, and contain the same declarations of trust. That executed by David Burns conveys to Thomas Beall and John M. Gantt (the trustees designated by the president) all the lands of the proprietor within the bounds of the city upon the following trusts, viz. 'that all the said lands, &c. as may be thought necessary or proper to be laid out together with other lands within the said limits for a federal city, with such streets, squares, parcels and lots as the president of the United States, for the time being, shall approve; and that the said (the trustees), &c. shall convey to the commissioners for the time being appointed by virtue of the act of congress, entitled, &c. and their successors for the use of the United States for ever, all the said streets, and such of the said squares, parcels and lots, as the president shall deem proper for the use of the United States; and that as to the residue of the said lots into which the lands, &c. shall be divided, a fair and equal division of them shall be made, and if no other mode of division shall be agreed on by consent of the said (grantor) and the commissioners for the time being, then such residue of the said lots shall be divided, every other lot alternate, to the said (grantor), &c. and all the said lots which may in any manner be divided or assigned to the said (grantor) shall thereupon, &c. be conveyed by the said (trustees) to the said (grantor), his heirs and assigns; and that the said other lots shall and may be sold at such time, &c. &c. as the president of the United States for the time being shall direct; and that the said (trustees), & c. will, on the order and direction of the president, convey all the lots so sold, and ordered to be conveyed, to the respective purchasers in fee simple, & c. &c.
 
 
 248
 Provision is then made that the twenty-five pounds per acre, to be paid by the United States for the squares, should be paid out of the proceeds of such sales, and the residue shall be paid to the president, as a grant of money to be applied for the purposes, and according to the act of congress.
 
 
 249
 Provision is also made for other objects, not material to be mentioned, and for a conveyance of the trust property to such other persons as the president might thereafter direct, in fee; 'subject to the trusts then remaining to be executed, and to the end that the same may be perfected.' In pursuance of this last provision, Beall and Gantt, the trustees, made a conveyance of the premises by an indenture, dated the 30th of November 1796, to certain commissioners appointed under the act of congress, subject to the trusts then remaining to be executed; and, among other things, conveyed to the commissioners all that part of the lands, &c. which had been laid off into squares, parcels or lots for buildings, and now remaining so laid off in the city of Washington.
 
 
 250
 Now it is important to observe, that the object of the indenture to Beall and Gantt in 1791, was to carry into full and entire effect the preliminary agreement entered into by the proprietors. There is no pretence to say that that indenture has not fully carried that agreement into effect. There is no allegation in the bill of any mistake in the draft of the indenture, or that the instrument was not precisely what the parties intended it should be. The argument at the bar has not attempted to set up any such mistake as a ground of equity. And indeed, after such a lapse of time, and acquiescence in its legal accuracy and sufficiency by all the parties; and after so many acts done under it, which have been silently confirmed by the parties; it would be impossible to insist upon any such mistake with a chance of success. We must take the indenture, therefore, as we find it, as a complete execution of the preliminary agreement, and as expressing the true intent and definitive objects of the parties. The preliminary agreement then became, upon the execution of the indenture, functus officio, and was merged in the more formal and solemn stipulations of the latter. It was no longer executory, but executed. The indenture itself contained many executory trusts; and so far as any of them yet remain unexecuted, the instrument itself may still be denominated executory. But so far as the trusts have been fulfilled, as by the conveyance of lots to the grantors, or to purchasers, and especially by the conveyance of the streets and squares, &c. to the commissioners in 1796, the indenture can no longer be deemed executory. Its functions have been final and complete.
 
 
 251
 We need not therefore inquire into the distinction taken in a court of chancery, between executory and executed agreements; or into the extent to which its equitable jurisdiction will be interposed to reform instruments upon grounds of mistake, or to grant other relief: because the present bill presents no case falling under either predicament. Here we have a solemn instrument embodying the final intentions and agreements of the parties, without any allegation of mistake; and we are to construe that instrument according to the legal import of its terms.
 
 
 252
 Now, upon such legal import, there do not seem grounds for any reasonable doubt. The streets and public squares are declared to be conveyed 'for the use of the United States for ever.' These are the very words which by law are required to vest an absolute unconditional fee simple in the United States. They are the appropriate terms of art, if we may so say, to express an unlimited use in the government. If the government were to purchase a lot of land for any general purpose, they are the very words which the conveyance would adopt, in order to grant an unlimited fee to the use of the government. There are no other words or references in the instrument which control in any manner the natural meaning of them. There are no objects avowed on the face of it, which imply any limitation. How then can the court defeat the legal meaning, and resort to a conjectural intent?
 
 
 253
 It has been said, that by looking at the preliminary agreement, the court will see that terms of a more limited nature are there used. Be it so. But will that justify the court in resorting to it to explain or limit the legal import of words in a solemn instrument, which contains no reference to it? If we could resort to it, the natural conclusion would be, in the absence of all contrary proof, that the last instrument embodied the real intent of the parties; that the preliminary agreement either imperfectly expressed their intent, or was designedly modified in the final act. The general rule of law is, that all preliminary negotiations and agreements are to be deemed merged in the final, settled instruments executed by the parties; unless a clear mistake be established. In this very case, it may be true, for aught that appears, that the president might have insisted upon the introduction into the trust deed of the very words in controversy, to the use of the United States for ever, in order to avoid the ambiguity of the words of the preliminary agreement. He may have required an unlimited conveyance to the United States; so that they might be unfettered in any future arrangements for the promotion of the health, the comfort, or the prosperity of the city. But it is sufficient for us, that here there is a solemn conveyance, which purports to grant an unlimited fee in the streets and squares, to the use of the United States; and we know of no authority which would justify us in disregarding the terms, or limiting their import, where no mistake is set up and none is established. It would, indeed, be almost incredible that any substantive mistake should have existed, and never have been brought to the notice of the trustees, or to that of the commissioners, upon their succeeding to the trust; or seriously insisted on by any party, down to the time of filing the present bill. The present is not a bill to reform a contract or deed; but to assert rights supposed to grow out of the trusts declared in the deed.
 
 
 254
 This view of the matter renders it unnecessary for the court to go into an examination of the facts insisted upon in the answer to repel the allegations in the bill, or to disprove the equity which it asserts. If the United States possess, as we think they do, an unqualified fee in the streets and squares, that defeats the title of the plaintiffs, and definitively disposes of the merits of the cause.
 
 
 255
 It is the opinion of the court, Mr Justice Baldwin dissenting, that the decree of the circuit court, dismissing the bill, be affirmed with costs.