POTOMAC STEAMBOAT COMPANY & Others *v.*
UPPER POTOMAC STEAMBOAT COMPANY.

POTOMAC STEAMBOAT COMPANY *v.* INLAND AND
SEABOARD COASTING COMPANY.

APPEALS FROM THE SUPREME COURT OF THE DISTRICT OF
COLUMBIA.

Argued November 26th, 27th, 28th, 1883.—Decided January 7th, 1884.

*Deed—District of Columbia—Maryland—Riparian Rights—Statutes—*
*Virginia—Washington, City of.*

1. In 1791, one Young, then owning a tract of land containing about 400
   acres on the Potomac, conveyed the same in fee simple with all its ap-
   purtenances to two trustees (who were also trustees with similar trusts,
   for other owners of land), as a site for the City of Washington. The
   trust provided that the lands laid out in streets, squares, etc., should be
   for the use of the United States forever, and that a fair and equal
   division of the remainder should be made. In 1794 the plan of the city
   was adopted and promulgated. On this plan a public street called Water
   street was represented as laid out on the margin of the river over the
   tract so conveyed by Young; but this street was not in fact constructed
   until after the close of the late civil war. In 1796 the trustees conveyed
   the tract so deeded to them (including Young's), "in fee simple subject
   to trusts yet remaining," to commissioners appointed to receive title,
   under the act of July 16th, 1790, entitled, "An Act for establishing the
   temporary and permanent seat of the government of the United States."
   1 Stat. 130. In 1797 the commissioners, in execution of the trust, and
   in pursuance of a statute of the State of Maryland, recorded certificates
   in their record book; which stated that one tract, defined by metes and
   bounds, had been allotted to Young, and that another tract, in like man-
   ner defined, had been allotted to the United States. Each of these tracts
   was on the northerly side of Water street, and was described as bounded
   on that street. The title to both became subsequently vested in the
   plaintiffs : *Held*, That these transactions were equivalent to a convey-
   ance by Young to the United States in fee simple of all his lands; and of
   a conveyance back by the United States, of the first tract described by
   metes and bounds, leaving in the United States the title in fee simple to
   the other tract and to the strip known as Water street. *Van Ness* v.
   *The Mayor, &c., of Washington,* 4 Pet. 232, approved and followed.

2. After the execution of the commissioners' certificate in 1797, allotting to
   Young a tract of land on the north side of Water street and to the
   United States another tract, also on the north side of that street, no
   wharfage rights remained connected with the use and enjoyment of those

lots, and not being thus connected with them, such right was not annexed as an incident to them, so as to become appurtenant to them.

3. The agreement of March 28th, 1785, between Virginia and Maryland, provided that citizens of each should have full property in the shores of the Potomac and the privilege of constructing wharves and improvements. The Maryland act of December 19th, 1791, authorized the commissioners appointed under the act of July 16th, 1790, 1 Stat. 130, to license the building of wharves on the Potomac: *Held,* That the United States, as owners in fee of Water street in the city of Washington, were in the enjoyment of all the rights which were attached to that property by this compact and by this legislation, or which belonged or appertained to it by virtue of general principles of law relating to riparian rights. The authorities in this court, and other federal courts, and in State courts and the courts of Great Britain, on that subject examined.

4. The act of the legislature of Maryland of December 28th, 1793, under which the commissioners entered in their record book the certificate to Young and to the United States, provided that they should " be sufficient and effectual to vest the legal estate in the purchasers, without any deed or formal conveyance : " *Held,* That parol evidence is only admissible to contradict, vary, or explain them, when it would have been admissible if they had been formal conveyances.

5. *Chesapeake & Ohio Canal Co.* v. *Union Bank of Georgetown,* 5 Cranch C. C. 509, cannot be regarded as the law of the District of Columbia on the point involved in this case. In so far as in conflict with it, the court in that case did not follow *Van Ness* v. *Mayor, &c., of Washington,* 4 Pet. 232, or *Kennedy* v. *Washington,* 3 Cranch C. C. 595.

Bill in equity to restrain the defendants below, who are the appellees in this court, from constructing piers and docks on the Potomac, at the city of Washington. The plaintiffs, being in possession of a tract of land bounded by Water street, which was on the margin of the river, claimed that the riparian rights on the side of the street opposite to their tract attached to it. The defendants denied the plaintiffs' title to such riparian rights, and justified their own acts under a license from the commissioners of the District of Columbia, who claimed title to the river front and riparian rights through deeds vesting the fee simple of Water street, in the city of Washington, in the United States.

The injunction prayed for was refused below. The plaintiff appealed.

*Mr. Conway Robinson* and *Mr. John Selden* for the appellants.

*Mr. William Birney* and *Mr. Nathaniel Wilson* for the appellees.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

These two cases were heard together in the court below and in this court. They involve the same questions and depend upon facts substantially the same, appearing in a single record.

The claim of the appellants, who were plaintiffs below, is that, being owners and in possession, in the first case, of square No. 472, and, in the second, of lot No. 13 in square No. 504, on the plan of the city of Washington, they are entitled to the exclusive right to make and use wharves and other similar improvements in the Potomac River opposite or in front of these lots, which are separated from it by Water street; and the object of the bills is to restrain the defendants, by a perpetual injunction, from intruding upon and disturbing the enjoyment of their right. This claim is denied by the defendants, who assert an adverse right under public authorities acting in the name of the United States. This issue was determined by the court below in favor of the defendants by decrees dismissing the bills, which decrees these appeals bring before us for review.

The plaintiffs derive title to the lots mentioned by mesne conveyances from Notley Young, who was the original proprietor of a tract of about four hundred acres, known as the Dudington Pastures, lying upon the Potomac River, and which became part of the site of the city of Washington, extending along the river from at or near the mouth of Tiber Creek to the grounds of the United States Arsenal.

The seventh clause of the compact between Virginia and Maryland of March 28th, 1785, declared that:

"The citizens of each State respectively shall have full property in the shores of the Potowmack River adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river."

The nature and extent of this compact were considered by this court in *Georgetown* v. *Alexandria Canal Co.*, 12 Peters, 91, where it was declared to be a compact between the States as such, to which the citizens of neither were parties, and, being subject to the will of the States, as to any changes in its stipulations, it was equally under the control of Congress, after the cession. It was provided, however, by the act of July 16th, 1790, 1 Stat. 130, accepting the District of Columbia as the seat of the government of the United States, "that the operation of the laws of the State within such district shall not be affected by this acceptance, until the time fixed for the removal of the government thereto, and until Congress shall otherwise by law provide."

It was therefore provided by the general assembly of Maryland, by an act of December 19th, 1791, sec. 12, that the commissioners of the District, appointed by the President under the act of Congress of July 16th, 1790,

"Shall, from time to time, until Congress shall exercise the jurisdiction and government within the said territory, have power to license the building of wharves in the waters of the Potomac and the Eastern Branch, adjoining the said city, of the materials, in the manner, and of the extent they may judge durable, convenient, and agreeing with general order. But no license shall be granted to one to build a wharf before the land of another, nor shall any wharf be built in the said waters without license as aforesaid ; and if any wharf shall be built without such license, or different therefrom, the same is hereby declared a common nuisance." Davis, 64.

In pursuance of this authority, the commissioners adopted the following regulation on the subject, dated July 20th, 1795:

"That all the proprietors of water lots are permitted to wharf and build as far out into the river Potomac and the Eastern Branch as they think convenient and proper, not injuring or interrupting navigation, leaving a space, wherever the general plan of the streets in the city requires it, of equal breadth with those streets, which, if made by an individual holding the adjacent prop-

erty shall be subject to his separate occupation and use until the public shall reimburse the expense of making such street, and where no street or streets intersect said wharf; to leave a space of sixty feet for a street at the termination of every three hundred feet of made ground ; the buildings on said wharves or made ground to be subject to the general regulations for buildings in the city of Washington, as declared by the President. Wharves to be built of such materials as the proprietors may elect." Proceedings of Commissioners, 1791 to 1795, 408, 409.

This regulation was submitted to President Washington, who directed it to be published, by letter dated at Mt. Vernon, September 18th, 1795.

In the mean time, Notley Young and the other proprietors whose proposal had been accepted, by distinct conveyances, but in like form, had conveyed to Thomas Beall and John M. Gantt, as trustees, the several tracts of land which were to constitute the territory of the city of Washington. That of Notley Young was dated June 29th, 1791, and conveyed, in fee-simple, "all the lands of him, the said Notley Young," therein described, to have and to hold, "with their appurtenances," in consideration "of the uses and trusts" therein mentioned, and "to and for the special trusts following, and no other."

" That all the lands hereby bargained and sold, or such part thereof as may be thought necessary or proper to be laid out, together with other lands within the said limits, for a federal city, with such streets, squares, parcels, and lots as the President of the United States for the time being shall approve ; and that the said Thomas Beall, of George, and John M. Gantt, or the survivor of them, or the heirs of such survivor, shall convey to the commissioners for the time being, appointed by virtue of the act of Congress, entitled ' An Act for establishing the temporary and permanent seat of the government of the United States,' and their successors, for the use of the United States forever, all the said streets and such of the said squares, parcels, and lots as the President shall deem proper, for the use of the United States ; and that, as to the residue of said lots into which the said lands hereby bargained and sold shall have been laid off and divided, that a fair

and equal division of them shall be made ; and if no other mode of division shall be agreed on, by consent of the said Notley Young and the commissioners for the time being, then such residue of the said lots shall be divided, every other lot alternate to the said Notley Young ; and it shall in that event be determined by lot whether the said Notley Young shall begin with the lot of the least number laid out on the said lands or the following number ; and all the said lots which may in any manner be divided or assigned to the said Notley Young shall thereupon, together with any part of the said bargained and sold lands, if any, which shall not have been laid out on the said city, be conveyed by the said Thomas Beall of George and John M. Gantt, or the survivor of them, or the heirs of such survivor, to him, the said Notley Young, his heirs and assigns," &c.

It was also stipulated therein, that the said Beall and Gantt should, at the request of the President of the United States, convey all or any of said lands which should not then have been conveyed in execution of the trusts aforesaid to such persons as he should appoint, in fee simple, subject to the trusts remaining to be executed, and to the end that the same might be perfected. Accordingly, on October 3d, 1796, the President requested Beall and Gantt to convey all the unconveyed residue of the land granted by Notley Young to Scott, Thornton, and White, then commissioners, appointed under the act of July 16th, 1790, " in fee simple, subject to the trusts yet remaining to be executed ;" and on November 30th, 1796, Beall and Gantt accordingly conveyed by deed, in fee simple, to the commissioners last named.

In the mean time, however, the plan of the city had been adopted and promulgated, on maps of which were laid out the squares, lots, public grounds and streets; and, on October 18th, 1794, a division of the property had been made between Notley Young and the commissioners, in execution of the trusts of the deed from him to Beall and Gantt, by which square No. 504 fell to the public, and square No. 472 to Notley Young.

No deed was made by Beall and Gantt to Notley Young for square No. 472, but on January 13th, 1797, the commissioners

recorded in their book, which by law they were authorized to keep for that purpose, their certificate that they and Young had agreed " that the whole of the same square shall remain to the said Notley Young, agreeably to the deed of trust concerning lands in the said city," and attached thereto a plat of the square, with boundaries, as follows: " Bounded on the north by L street, four hundred and seventy-nine feet four inches; the south by M street south, three hundred and fifty-seven feet three inches; the east by 6th street west, two hundred and eighty-nine feet ten inches; the southwest by Water street, three hundred and fourteen feet three inches," as per return dated December 24th, 1793.

A similar entry and record were made in respect to square 504, the plat of which shows a subdivision of the entire square into lots, of which five, lot No. 13 being one of them, front on Water street, running back to an alley which separates them from all the other lots in the square.

The legal title to this and other squares allotted to the public passed to the commissioners of the District by deed from Beall and Gantt; and the legal estate to square 472 and the others allotted to Notley Young vested in him in fee simple, by virtue of the certificates recorded in the commissioners' book, under a law of Maryland of December 28th, 1793, Burch's Dig. 224, which gave effect to it, "according to the import of such certificates."

A similar certificate was made and recorded October 18th, 1794, to the effect that James Greenleaf had become the purchaser of 857 lots, for which he had fully paid, the legal title to which in fee simple had vested in him, and among them is enumerated square 504. The plaintiffs claim lot 13 in that square under Greenleaf's title.

It has been observed that both squares No. 472 and No. 504 are bounded on the southwest by Water street. This street was designated on the adopted plan of the city as occupying the whole line of the river front, and separating the line of the squares from the river for the entire distance from 14th street to the arsenal grounds. It is alleged in the bill in respect to this street that there was traced on the map of the city

"but a single line denoting its general course and direction; that the dimensions of said Water street, until the adoption, on the 22d day of February, 1839, of the certain plan of one William Elliott, as hereinafter more particularly mentioned, were never defined by law; and that the said Water street was never, in fact, laid out and made in the said city until some time after the close of the recent civil war; that before the commencement of said civil war one high bluff or cliff extended along the bank of said river, in said city of Washington, from Sixth street west to 14th street west; that to the edge thereof. the said bluff or cliff, between the points aforesaid, was in the actual use and enjoyment of the owners of the land which it bounded towards the said river; that public travel between the two streets last above mentioned, along the said river, could only be accomplished by passing over a sandy beach, and then only when the tide was low; and that what is now the path of Water street, between the two streets aforesaid, was and has been made and fashioned by cutting down the said cliff or bluff and filling in the said stream adjacent thereto."

These allegations, in substance, are admitted in the answer to be true, with the qualification that the width of the street was left undefined because it constituted the whole space between the line of the squares and the river, whatever that might be determined to be from time to time, but that the commissioners, on March 22d, 1796, made an order directing it to be laid out eighty feet in width from square 1079 to square east of square 1025, and to "run out the squares next to the water and prepare them for division," and that it was so designated on maps of the city in 1803. If not, the inference is all the stronger that the whole space south of the line of the lots was intended to be the property and for the use of the public. *Barclay* v. *Howell's Lessees*, 6 Pet. 498. In *Rowan's Ex'rs* v. *Portland*, 8 B. Monroe, 232–239, that inference was declared to be the legal result of such a state of facts. It is quite certain that such a space was designated on the official map of the city as originally adopted. the division and sale of the squares and lots being made in reference to it. What the legal effect of that fact is we shall hereafter inquire, and while we do not

consider it to be qualified by the circumstances set forth as to the actual history of the street as made and used, they perhaps sufficiently account for the doubt and confusion in which the questions of right brought to issue in this litigation seem for so long a period to have been involved.

The transaction between Notley Young and the public authorities, as evidenced by the documents and circumstances thus far set forth, was equivalent in its result to a conveyance by him to the United States in fee simple of all his land described, with its appurtenances, and a conveyance back by the United States to him of square No. 472, and to Greenleaf of square No. 504, bounded and described as above set forth, leaving in the United States an estate in fee simple, absolute for all purposes, in the strip of land designated as Water street, intervening between the line of the squares as laid out and the Potomac river.

The very point as to the nature of this title was decided in the case of *Van Ness* v. *The Mayor, &c., of Washington,* 4 Pet. 232. It was there said by Mr. Justice Story, delivering the opinion of the court, p. 285:

"Here we have a solemn instrument embodying the final intentions and agreements of the parties, without any allegations of mistake, and we are to construe that instrument according to the legal import of its terms. Now, upon such legal import, there do not seem grounds for any reasonable doubt. The streets and public squares are declared to be conveyed 'for the use of the United States forever.' These are the very words which by law are required to vest an absolute unconditional fee-simple in the United States. They are the appropriate terms of art, if we may so say, to express an unlimited use in the government. If the government were to purchase a lot of land for any general purpose, they are the very words which the conveyance would adopt, in order to grant an unlimited fee to the use of the government. There are no other words or references in the instrument, which control in any manner the natural meaning of them. There are no objects avowed on the face of it which imply any limitation. How, then, can the court defeat the legal meaning and resort to a conjectural intent?"

It was accordingly decided in that case that the ownership of the land over which the streets in the city of Washington had been laid out on the original plan was vested by the deeds of the proprietors in the United States so completely and unconditionally that Congress might lawfully dispose of it to private persons, or otherwise convert it to any use whatever.

It was also decided in that case that the legal effect of the final instrument which defined and declared the intentions and rights of the parties, could not be modified or controlled by proof of any preliminary negotiations or agreement. "The general rule of law is," said the court, "that all preliminary negotiations and agreements are to be deemed merged in the final settled instruments executed by the parties, unless a clear mistake be established." This applies not only to the formal deeds from Notley Young to Beall and Gantt, and from them to the commissioners, but also to the certificates and plats made and recorded by the latter; which, under the Maryland act of December 28th, 1793, Burch's Dig. 224, " shall be sufficient and effectual to vest the legal estate in the purchasers, their heirs and assigns, according to the import of such certificates, without any deed or formal conveyance." It is under and according to these certificates, granted to Notley Young and Greenleaf, that the plaintiffs derive their title ; and parol evidence to contradict, vary, or explain them, is no more to be admitted than if they were formal conveyances. *Williams* v. *Ingell*, 21 Pick. 288.

For this reason we reject, as without legal value, the book called " Division Book No. 1," referred to as showing a list of the squares and lots assigned to Notley Young in the division, and containing an entry as to square 472 as having a water front of 314 feet, 3 inches. It is not well authenticated as a contemporary and original book, and is not one which it was the official duty of the commissioners to keep. However convenient, therefore, it may be as a book of reference for examiners of title in facilitating searches, it has not the quality of a public record.

What effect upon the riparian rights of Notley Young would have resulted from the creation of a perpetual easement for a

public way over Water street by a grant to the United States to that use alone, the title and right of possession in the soil for all other purposes remaining in the original proprietor, it is unnecessary to discuss. The decisive circumstance in the present case is, that the United States became the riparian proprietor, and succeeded to all the riparian rights of · Notley Young, by becoming the owner in fee simple absolute of the strip of land that adjoined the river, and intervened between it and what remained to the original proprietor, Notley Young, after that conveyance; and the successors to his title had no other or greater rights in Water street, or the land on which it was laid out and eventually made, than any other individual members of the public. While it remained a street it was subject to their use as a highway merely, over which to pass and repass, and without the consent of the United States as proprietor was subject to no private use whatever. The right of wharfage remained appurtenant to it, because, as land adjacent to the river, that right was annexed to it by law, and could be exercised on it by the proprietor; but was severed, by the severance of the title, from the remainder of the original tract, to the whole of which it had formerly pertained.

In reference to the squares and lots lying north of the street, it may be said of the wharfage right claimed, as was said in *Linthicum* v. *Ray*, 9 Wall. 241, 243, " It was in no way connected with the enjoyment or use of the lot, and a right not thus connected cannot be annexed as an incident to land, so as to become appurtenant to it."

A riparian proprietor, in the language of Mr. Justice Miller in *Yates* v. *Milwaukee*, 10 Wall. 497–504, is one " whose land is bounded by a navigable stream ;" and among the rights he is entitled to as such, are " access to the navigable part of the river from the front of his lot, the right to make a landing, wharf, or pier for his own use or for the use of the public, subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public, whatever those may be." *Weber* v. *Harbor Commissioners*, 18 Wall. 57.

In Massachusetts, where it is held that, by virtue of the

ordinance of 1647, if lands be described as bounded by the sea, the grantee will hold the lands to low-water mark, so that he does not hold more than one hundred rods below high water mark; *Storer* v. *Freeman*, 6 Mass. 435; *Commonwealth* v. *Charlestown*, 1 Pick. 179; yet, it is also held, that where an ancient location or grant by the proprietors of a township bounded the land granted by a way, which way adjoined the sea shore, the ordinance did not pass the flats on the other side of the way to the grantee. *Codman* v. *Winslow*, 10 Mass. 146. And in Maine it was decided that a grantee, bounded by high-water mark, is not a riparian proprietor nor within the ordinance. *Lapish* v. *Bangor Bank*, 8 Greenleaf, 85. In New Jersey it is spoken of as "the right of an owner of lands upon tide waters to maintain his adjacency to it and to profit by this advantage," *Stevenson* v. *Paterson, &c., R. R. Co.*, 5 Vroom, 532–556, and as a right "in the riparian owner to preserve and improve the connection of his property with the navigable water." *Keyport Steamboat, &c., Co.* v. *Farmers' Transportation Co.*, 3 C. E. Green, 516. The riparian right "is the result of that full dominion which every one has over his own land, by which he is authorized to keep all others from coming upon it except upon his own terms." *Rowan's Ex'rs* v. *Portland*, 8 B. Monroe, 232. It is "a form of enjoyment of the land and of the river in connection with the land." Lord Cairns in *Lyon* v. *Fishmonger's Co.*, 1 Appeal Cas. 662, 672. "It seems to us clear," said Pollock, C. B., in *Stockport Water Works Co.* v. *Potter*, 3 Hurl. & Colt. 300–326, "that the rights which a riparian proprietor has with respect to the water are entirely derived from his possession of land abutting on the river. If he grants away a portion of his land so abutting, then the grantee becomes a riparian proprietor and has similar rights."

No inference in such a case arises against the riparian right of the grantee because the land has been granted for a street. On the contrary, as was said in *Barney* v. *Keokuk*, 94 U. S. 324–340, "a street bordering on the river, as this did, according to the plan of the town adopted by the decree of partition, must be regarded as intended to be used for the purposes of

access to the river and the usual accommodations of navigation in such a connection;" that is, as it appears by the decision in that case, to be used by the public for such purposes, as well as a highway, in contradistinction to the exclusive right of one claiming riparian rights as owner of the soil. *Godfrey* v. *The City of Alton*, 12 Ill. 29. "If the city," said this court in *New Orleans* v. *The United States*, 10 Pet. 662–717, " can claim the original dedication to the river, it has all the rights and privileges of a riparian proprietor."

Notley Young and the successor to his title had no property in the street, not even the right to insist that it should be maintained as such. The United States held its title to the land over which it was laid out, for its own use, and not in trust for any person or for any purpose. In that respect the case differs from *Railroad Company* v. *Schurmeir*, 7 Wall. 272, where it was held that, as the city held the title to the street only in trust for the purposes of its dedication as such, the title remained in the original proprietor for all other purposes, and with a property right in its use as a street for his adjacent land.

And it is immaterial that the ground laid out as a street was not in a condition to be used as a street, or that much labor was required to place it in that situation, or that, in fact, it had not been used as such for a long period of time. *Barclay* v. *Howell's Lessee*, 6 Pet. 498–505; *Boston* v. *Lecraw*, 17 How. 426. "A man cannot lose the title to his lands," it is said in this case, "by leaving them in their natural state without improvement, or forfeit them by non-user," p. 436. *McMurray* v. *Baltimore*, 54 Md. 103.

This denies no right that can be claimed by virtue of the compact between Virginia and Maryland of 1785; for that secured to their citizens "the privilege of making and carrying out wharves," as to the shores of the Potomac, only and so far as they were " adjoining their lands," and such had always been the law of Maryland, notwithstanding the language of the act of 1745, ch. 9, sec. 10, which was held to authorize the improvements therein spoken of, to be made by improvers in front of their own lots only. *Dugan* v. *Baltimore*, 5 Gill & Johns. 357; *Wilson's Lessee* v. *Inloes*, 11 Gill & Johns. 351. The

" full property in the shores of Potowmack river," spoken of in the compact, if it is not to be taken as a *seizin* of the land covered with water, but a right of occupation merely, properly termed a franchise, as said by Hosmer, C. J., in *East Haven* v. *Hemingway*, 7 Conn. 186–202, must be appurtenant to the land, the conveyance of which carries it as an incident ; otherwise, if it implies an ownership in the soil of the shore between high and low-water mark, as land, it could not pass as an appurtenance by a deed conveying the adjoining land ; for land cannot be appurtenant to land. *Harris* v. *Elliott,* 10 Pet. 25–54 ; *Storer* v. *Freeman,* 6 Mass. 435 ; *Commonwealth* v. *Alger,* 7 Cush. 53. And in this view the title of the plaintiffs fails, because they show no conveyance of the *locus in quo,* as parcel, and claim it only as an appurtenance.

An act of Maryland of January 22d, 1785, authorizing an addition to Georgetown of land, according to a plat and upon conditions prescribed by the proprietors, confirms this view of the state of the general law in Maryland, by making express statutory provision " that the proprietors of the lots fronting on the north side of Water street shall have and enjoy the exclusive right to the ground and water on the south side of their respective lots for the sole purpose of making wharves," &c. The inference is irresistible, that this was meant to give statutory sanction to an exception from the general rule. The same comment applies to the case of *Hazlehurst* v. *Baltimore,* 37 Md. 199, to which we are referred. There the street or highway that intervened between the wharf and the water was, by virtue of the statutes under which the work was executed, made part of the wharf itself, and subject to the right of the lot owner for the purposes of a wharf, and to that extent it was held he had a right of property in it, of which he could not be deprived for public use, except upon due compensation made.

It is not denied and never was questioned that, as to the streets whose termini abutted on the river, the water front was subject to the riparian rights of the public for use as wharf or dock or landing place. On what principle can a distinction be drawn between that case and the one in hand, where the line of the river constitutes the side of the street running along

the shore? The rights of the public are the same; especially where, as here, it was the owner of the soil of the street, as so much land, for all purposes. The true inference to be drawn from the plan of laying out such a street seems to us to be to secure to the public the very rights here in controversy, and to prevent private monopoly of the landing places for trade and commerce. For, as was said in *Dutton* v. *Strong*, 1 Black, 1–32:

"Piers or landing places and even wharves may be private,"— "or, in other words, the owner may have the right to the exclusive enjoyment of the structure, and to exclude all other persons from its use;" the question whether they are so, or are open to public use on payment of reasonable compensation as wharfage, depending in such cases "upon several considerations, involving the purpose for which they were built, the uses to which they have been applied, the place where located, and the nature and character of the structure."

Undoubtedly Notley Young, prior to the founding of the city and the conveyance of his land for that purpose, was entitled to enjoy his riparian rights for his private uses and to the exclusion of all the world besides. It can hardly be possible that the establishment of the city upon the plan adopted, including the highway on the river bank, could have left the right of establishing public wharves, so essential to a great centre of population and wealth, a matter altogether of private ownership; for even as to squares and lots that fell to the public on the division, it is equally contended by the appellants that those from whom they claim, with the lots also purchased the public riparian right appurtenant thereto, with power to convert it to private use.

It was for this reason held by the Court of Appeals of Kentucky, in the case of *Rowan's Ex'rs* v. *Portland*, 8 B. Monroe, 232, that where land along the river bank in a town had been laid out and dedicated by the proprietor for a public street, the dedication for that purpose carried with it, as a necessary incident, the right in the public to build wharves and charge wharfage for the use thereof, to the exclusion of the original

proprietor and his alienees of any private right of the same character.

To the same effect is the judgment of the same court in *Newport* v. *Taylor's Ex'rs*, 16 B. Monroe, 699–804.

Various considerations, however, are urged upon us in argument in support of the appellants' claim, which, so far as we deem important, and the limits of this opinion will permit, we will now notice in order.

1. It is urged that the construction of the rights of the parties which deprive the claimants under Notley Young and Greenleaf of the rights of wharfage opposite their property on the north side of Water street, in effect gives to the United States the entire water front on the Potomac river, without an equivalent, and thus violates that equality in the division which was expressly stipulated for in Notley Young's deed to Beall and Gantt.

But there is no dispute as to the division that was actually made, and each party received, so far as the conveyances are concerned, precisely what he agreed to take and was satisfied with. The supposed inequality arises from a construction of law upon the transaction, as it is admitted or proved to have taken place, and its legal effect is not dependent upon its actual results. The division, which it was agreed should be fair and equal, was of the lots into which the lands should be laid off; the grantor was to receive back any lands not so laid off, and the streets were to be the property of the United States, and, of course, with whatever appurtenant rights belonged to them as streets, or to the land over which they were laid out.

2. It is insisted, however, that the contemporaneous construction put by the parties themselves upon their own acts, requires a different conclusion.

It is impracticable to refer specifically to the numerous letters, maps, plans, documents, and records of different descriptions, which the diligent research of counsel on both sides has compiled and placed in the record of these cases, as throwing light on the history of the transaction, and as evidence of the views of the actors in it. We can notice but a few, with the general remark that a careful consideration of everything bear-

ing on the point to which our attention has been called, has failed to satisfy us that the conclusion reached, as the legal effect of the documents of title, is inconsistent with the actual intentions of the parties.

In a letter to the President, explaining their regulations of July 20th, 1795, the commissioners distinctly say, "that no wharves, except by the public, can be erected on the waters opposite the public appropriations, or on the streets at right angles with the water;" and that it is "proprietors of property lying on the water" that are to be permitted to build wharves. It is possible, indeed, that the commissioners did not, at that time, contemplate that a street laid out along the margin of the river, as Water street was, would be on the same footing with what they deemed to be "public appropriations;" and yet there is nothing in their communication inconsistent with that result, and the idea is clearly embraced in it when we apply the decision in the Van Ness case to its terms.

And their view to that effect is strongly implied in what they wrote to James Barry on October 5th, 1795. He had written to them, saying that,

"As Georgia avenue meets the water at 3d street, and can only begin again at the other side of the water, I request permission to erect a store or buildings, agreeably to the regulations of the water property of square 771, without adverting to the imaginary direction of Georgia avenue, which runs across my wharf, and would totally render useless said wharf."

The commissioners replied, saying:

"We think with you that an imaginary continuation of Georgia avenue through a considerable depth of tide water, thereby cutting off the water privilege of square 771 to wharf to the channel, too absurd to form a part of the plan of the city of Washington; that it never was a part of the plan that such streets should be continued through the water, and that your purchase in square 771 gives a perfect right to wharf to any extent in front or south of the property purchased by you, not injurious to navigation, and to erect buildings thereupon, agreeably to the regulations."

It is plainly to be inferred from this, that if, as was the case of Water street, the street was laid down on the map as a continuous street, abutting on the river, and called for as the south boundary of the lots fronting on it, it would have been regarded by them as forming part of the plan of the city, " thereby cutting off the water privilege " from the lots between which and the river it intervened.

But on June 25th, 1798, the commissioners had occasion to declare themselves explicitly on the very point, in a letter to Nicholas King of that date, in answer to an inquiry from him in behalf of Robert Peter, requesting " to know the extent of wharfing and water privilege attached to what was called water lots and assigned to him on division." They replied as follows:

" Sir : We are favored with yours of the 22d instant, in behalf of Mr. Peter. When the commissioners have proceeded to divide a square with a city proprietor, whether water or other property, they have executed all the powers vested in them to act upon the subject. It appertains to the several courts of the State and the United States to determine upon the rights which such division may give. Any decision by us on the subject would be extra-judicial and nugatory. Of this, no doubt Mr. Peter, if applied to, would have informed you.

" With respect to square No. 22, we do not conceive that it is entitled to any water privilege, as a street intervenes between it and the water ; but, as there is some high ground between the water street and the water, we have no objection to laying out a new square between Water street and the channel, and divide such square when laid out, so as to make it as beneficial to Mr. Peter and the public as circumstances will admit."

A transaction between John Templeman and the commissioners on January 24th, 1794, is relied on as showing the rule acted upon in cases like the present. The commissioners, it is stated in the record of their proceedings of that date, sold to Templeman nine lots in square No. 8, and delivered him a certificate with the following indorsement thereon:

" It is the intention of this sale that the ground across the street

next to the water, with the privilege of wharfing beyond the
street in front and of the breadth of the lots, pass with them
agreeably to the general idea in similar instances."

On January 15th, 1798, the commissioners, it is recited in
the same record of that date, executed a deed to Templeman
of the lots named,

"Together with all the land in front from 27th street to river
Potomac, with all rights of wharfing thereon, which deed is given
by the request of Mr. Templeman in lieu of one dated the third
instant, with the addition of lot 18 in square No. 8, and the water
privilege in front of the lots conveyed in square No. 8, the former
deed having been first given up and cancelled."

It will be observed that this is open to the construction that
the wharfage privilege is appurtenant, not to the lots in square
No. 8, but to the land sold with them on the opposite side of
the street, and extending thence to the Potomac river, and
which, of course, is riparian property.

There was, in fact, no contemporary agreement of opinion
on the subject. On the contrary, there was diversity of view
and conflict of interest from the beginning. Various questions
arose relating to the mode in which the privilege of building
wharves should be exercised by those entitled to it, as well as
to what constituted "water lots," to which such privilege be-
longed, and some of them were left undecided. On some of
these the opinion of Charles Lee, Attorney-General, was taken
on January 7th, 1799; some were investigated and reported
upon by a committee of the house of representatives on April
8th, 1802; some were discussed by Attorney-General Breckin-
ridge in an opinion dated April 5th, 1806; the very matter of
wharfing privileges was the subject of an opinion by Mr. Wirt,
then attorney-general, July 8th, 1818, in which he expressed
doubts as to the power of the commissioners to adopt the wharf
regulation of July 20th, 1795. The whole subject had been
presented in a very interesting manner, from the point of view
opposed to that expressed by the commissioners, but showing
that differences of opinion existed, by Nicholas King, in a letter

to the President, dated September 25th, 1803, and printed in Burch's Digest, 351. In that communication he attributed the doubt and uncertainty in which the matter was involved to the action of the commissioners. "In laying off the city," he says, "they stopped, as before observed, on the bank of the river, sold the lots on the high ground with a water privilege, without defining either what the privilege is or the extent or direction in which the purchasers were to wharf and improve."

3. A special ground is maintained in behalf of the claim under lot 13 in square 504 derived from Greenleaf.

On December 24th, 1793, the commissioners made a contract in writing with Morris and Greenleaf for the sale and conveyance of 6,000 lots, 4,500 to lie southwest of Massachusetts avenue, and of them Morris and Greenleaf were to have "the part of the city in Notley Young's land." By this contract, Morris and Greenleaf were excluded from selecting water lots, but with this proviso :

"Provided, and it is hereby agreed by and between the parties to these presents, that the said Robert Morris and James Greenleaf are entitled to the lots in Notley Young's land, and of course to the privileges of wharfing annexed thereto, and that lots adjoining the canal are not reckoned water lots."

From this it is sought to draw the inference that the lots in Notley Young's land fronting on the north side of Water street, have the appurtenant wharfing privileges claimed. But there is no sufficient foundation for this conclusion. Even if it were proper to resort to this preliminary agreement to supply what is not contained in the subsequent grant, made in execution of it—which, we have seen, on the authority of the case of *Van Ness*, we are not at liberty to do—still, there is nothing to identify square 504 as a water lot out of the property of Notley Young. On October 18th, 1794, as has been stated, the commissioners transferred to Greenleaf, Morris consenting, by certificate, 857 of these lots, including the one in question, and it may be that many of them were water lots, but which of them were is to be determined by the actual facts as to each, and not

by any general description. There were lots in Notley Young's land as laid out, which answered the description without reference to those lying on the north side of Water Street.

That there was on the original plan of the city, and in the division made between the original proprietors and the United States, a classification of the squares and lots into "water lots," with riparian privileges, and the rest which were not, admits of no dispute. The exact nature of the difference is well pointed out in a very elaborate report made May 25th, 1846, to the common council of the city, by a committee appointed to investigate the subject, and their conclusions on the point seem to us supported by the records and documents of the time. They say:

"Squares in the water with water lots were laid off by the commissioners and divided with the proprietors on the navigable waters of the Eastern Branch, Potomac, and Rock Creek. Water lots were defined by metes and bounds on three sides, and were estimated originally in the division, since in sales, and now for assessment, by the front foot. . . . On the plan of the city all the streets are delineated and all the property laid off. Every owner of a lot in the city can tell by the description of it in his deed what are its bounds on all sides ; if it has a water boundary, the deed says so, and he has a right to wharf out into the river; if it is bounded on all sides by the land, he has no such right, the right to wharf belonging only to land bounded by the water."

If there are any individual cases that are exceptions to these statements, nevertheless, their general accuracy we consider well established, and that they manifest the original intention of the parties to the transaction. Disputes undoubtedly arose, some quite early, not so much as to what rights belonged to "water lots," nor as to what properly constituted a "water lot," but, in regard to particular localities, whether that character attached to individual squares and lots. In part, at least, the uncertainty arose from the fact that the plan of the city, as exhibited on paper, did not accurately correspond at all points with the lines as surveyed and marked on the land. Complaints of that description, and of designed departures

from the plan, seem to have been made. It is also true, we think, that mistakes arose, as perhaps in the very case of the lots on the north side of Water street, owing to the fact that the street existed only on paper, and for a long time remained an unexecuted project; property appearing to be riparian, because lying on the water's edge, which, when the street was actually made, had lost its river front. They were thought to be " water lots," because appearing to be so in fact, but were not so in law, because they were bounded by the street and not by the river.

4. The plaintiffs rely upon the decision of the former circuit court for this district in the case of *Chesapeake and Ohio Canal Co.* v. *Union Bank of Georgetown*, 5 Cranch C. C. 509, decided in 1838. The question in that case was whether the owner of lots in the city of Washington, lying on Rock Creek, was entitled to compensation for a wharf and water privilege which had been condemned for the use of the canal company. It was contended on behalf of the latter that the owner of the lots never had any water privilege as appurtenant to them, because they were cut off from the creek by 28th Street west, and as the streets belonged to the United States, the water privilege belonged to them also. It appeared that Harbaugh, the owner, had built, maintained, and used a wharf in connection with the premises for thirty years without interruption, and that no part of the bank of the creek and no dry land lay west of the street, one half of which was in the creek. It also appeared that he had bought from the United States, to whom the lots had been allotted in the division of the square between the public and the original proprietor, but the terms of the conveyance from the United States to Harbaugh are not stated. It was argued for the owner that the streets were conveyed to the United States only as highways, and did not deprive the riparian proprietors of their water rights, and reference was made to Nicholas King's letter in Burch's Digest, to the wharf regulations of the commissioners in 1795, and to the Maryland act of 1791, ch. 45, § 12. The court, it is stated, held that the title of Harbaugh to his wharf was good against the United States, claiming under a private citizen (R. Peter), the original

proprietor, but gave no reasons for its opinion. No allusion was made by counsel or court to the case of *Van Ness* v. *Mayor*, *&c., of Washington*, 4 Pet. 232, which had been decided in 1830, and in which the only point, in behalf of the prevailing party made by counsel in the case in the circuit court, had been ruled the other way. For that reason the judgment cannot be considered as evidence of the law of this District upon the question involved.

The question of wharfage had been before the same court in another form in 1829, in the case of *Kennedy* v. *Corporation of Washington*, 3 Cranch C. C. 595. That was an application for a *mandamus* to compel the corporation to make regulations prescribing the manner of erecting private wharves within the limits of the city, the showing in support of the motion for the rule being that the relator was the purchaser of lot No. 1 in square No. 329, and that he had applied to the authorities for leave to build a wharf on that lot, and for directions in regard to the plan and construction of the wharf, all of which they had refused. Mr. Wallach, for the corporation, argued that the power of the corporation over the subject was within its discretion, which the court would not control. Mr. Jones, on the same side, referred to the opinion of N. King, in Burch's Digest, argued that it appertained to the courts of the several States and of the United States to determine upon these rights, and contended that the power of the commissioners upon the subject ceased to exist by the assumption of jurisdiction by Congress, February 27th, 1801, 2 Stat. 103; the power given to the corporation being only to regulate the manner of erecting private wharves, not to limit the extent of them, or to interfere with the right of owners of the land adjoining the river. The court refused the *mandamus*, it is said in the report, for the reasons stated in the argument of Mr. Jones and Mr. Wallach.

5. The decision just referred to in the case of Kennedy's application for a *mandamus*, explains, probably, some subsequent action of the corporate authorities on the subject of wharfage, on which the appellants rely as evidence and confirmation of their claims. One of the practical difficulties experienced in the matter of building wharves arose from the fact that con-

flicts between private claimants, and with acknowledged public rights at the termination of streets upon the river, would exist, if the wharf rights were extended to the channel between lines prolonged from the sides of the lots. This followed partly because the general course of the channel, measured by its chord, was less by about 280 feet than that of the shore line, and because the streets leading to the river were not parallel with the line of the lots. If any system of improvement, public and private, should be adopted, it would require an adjustment of these conflicts, and the subject became a matter of discussion in the municipal government and in the public press. On April 2d, 1835, William Elliot, the surveyor of the city, made a report on the subject to the mayor and corporation. In this report, he reviewed the history of the subject from the beginning, and concluded as follows :

"Therefore, from the foregoing authorities and arguments the following facts are clearly deducible :

"1. That the channels of navigable rivers of the United States cannot be obstructed.

"2. That the openings for the east and west streets, lying on the Potomac River and Rock Creek, must not be interrupted, but must be carried to the channel in straight lines ; and the openings for the north and south streets, facing on the Anacostia River, must also be left free to the channel.

"3. That the power to regulate the docks, wharves, &c., is vested in the corporation of Washington and the agents they may appoint.

"4. That no water privilege was specified or sold with the squares or lots, and that Water street was laid down on the plans of the city exhibited at the sales, and would appear to be the bounds of the lots and squares fronting the rivers.

"Having clearly established these powers and rights in the corporation, the following system of wharves and docks is respectfully submitted for consideration :

"1. Let Water street be laid down conformably to the plan of the city.

"2. Let openings of the streets be prolonged to the channel,

and in these openings, extending from Water street to the channel, let wharves be built upon piers.

" 3. Let docks be formed in front of the squares.

" The result of this system would be that all the wharves and docks would belong to the city of Washington ; that steamboats and other vessels would have deep water and sufficient room to lie at the end of the wharves or piers, and small craft and boats in the docks, the current of the river would not be interrupted, and the water would flow freely under the wharves, and prevent the accumulation of filth, the source of disease ; and the whole system would be perfectly conformable to the original plan of the city as laid down by the commissioners.

" Although I consider the above plan the best, and ought to have been adopted at the commencement of the city, yet, having understood that at the sale of the lots facing the rivers there was an implied water privilege sold at the same time, though *neither expressed nor defined,* this therefore would require that the spaces in front of the squares extending to the channel should be considered as *water privileges ;* and that openings left for the streets to the channel should be considered as docks, and belonging to the public ; also that the spaces in front of the intersection of streets facing the rivers, or any other not facing private property, should be considered as belonging to the public, on which public wharves or docks may be built.

" A section of the last proposed plan may be seen at the surveyor's office."

Accordingly the surveyor submitted a map showing his plan, upon the second hypothesis, that the lots facing Water street were entitled to be recognized as having wharfing privileges, in which he exhibited that street as one hundred feet wide in the narrowest part.

On July 13th, 1835, the following resolution was considered in the board of common council of the city of Washington :

" *Resolved,* That the corporation of Washington never has admitted, and cannot, without injury to the general interests of the city, admit, the existence of ' water rights of individuals ' between the Potomac bridge and the Anacostia, and therefore it is inexpedient to adopt any plan which can be construed into an admis-

sion of such rights, or to consider any proposition which claims such admission."

This resolution was indefinitely postponed by a majority of one vote.

Peter Force, a member of the council, well known in the public history of this city and country, by permission, entered on the journal the reasons for his dissent. These reasons were, briefly, that Water street belonged to the United States; that in the original plan of the city and division and sale of squares and lots, those only were recognized as water lots which were laid off running to the channels of Rock creek, the Potomac river, and the Eastern branch, respectively, all of which, on that account, were sold by the front foot, while all the others were laid off bounded by streets and avenues, without any water privileges, and were sold by the square foot; and, among others, that the motion for indefinite postponement of the resolution had been carried by the vote of a member who had a direct personal and pecuniary interest in the assertion of a private right involved in the resolution against that of the public.

In the meantime the discussion was transferred to the newspapers, Mr. Force representing one side of the controversy, and the mayor, Mr. Joseph H. Bradley, the other.

Nothing important seems to have been done by the city council until February 22d, 1839, when the following resolutions were adopted, and were approved by the President of the United States:

"Resolutions in relation to the manner in which wharves shall be laid out and constructed on the Potomac river.

"*Resolved*, *&c.*, That the plan No. 2, prepared by the late William Elliot, in eighteen hundred and thirty-five, while surveyor of the city of Washington, regulating the manner in which wharves on the Potomac, from the bridge to T street south, and the plan of Water street, shall be laid out, be, and the same is, adopted as the plan to be hereafter followed in laying out the wharves and the streets on the said river : *Provided*, The approbation of the President of the United States be obtained thereto.

" *Resolved, also,* That the wharves hereafter to be constructed between the points specified in the said plan shall be so built as to allow the water to pass freely under them ; that is to say, they shall be erected on piers or piles from a wall running the whole distance on the water line of Water street."

But these resolutions decide nothing as to the right, even if the corporate authorities of Washington were competent to do so, which they were not. The resolutions are not, however, even a recognition of the existence of any private right of wharfing attached to the ownership of lots fronting on the north side of Water street. At the most, they recognize that there may be such rights. In point of law, they merely regulate the mode in which the right shall be exercised, whether private or public, leaving the question as to title, in each case, to be judicially decided; for that was the extent of the jurisdiction which the corporation of Washington had over the subject.

To notice further the many items of evidence which are contained in the record, and have been referred to by counsel in learned and laborious arguments, would prolong this opinion to an unnecessary and inexcusable length. Enough has been said to show that the rights of the parties respectively stand upon the legal effect of the original documents of title. According to them, as we have shown and now decide, the riparian rights claimed by the appellants, which originally were appurtenant to the land of Notley Young by virtue of its adjoining the Potomac river; passed to the United States by the conveyance which vested in them the ownership of the land on which Water street was laid out and has been built.

The decree below, therefore, was right, and it is accordingly
*Affirmed.*

Mr. Justice Bradley did not sit in these cases.

Mr. Justice Miller, with whom concurred Mr. Chief Justice Waite and Mr. Justice Gray, dissenting.

In these cases the Chief Justice, Mr. Justice Gray, and myself do not agree with the judgment of the court. We concur in nearly all that is said in the opinion, and in the general prop-

osition that where a town lot or other land is bounded on a street or road or other highway, the fee to which is in some other person than the lot owner, his rights as a land owner do not extend beyond the street, and in case the street occupies the bank of a river or other water-way, no riparian rights attach to the lot or its owner. But we think the court has erred in the application of this doctrine to the present case by failing to give due weight to one or two considerations which we shall mention.

1. Notley Young was the original and sole owner in fee simple of that part of the land on which Washington city was laid out, which includes the *locus in quo,* and there is no question that this ownership included the right to erect wharves on it on the Potomac river where the wharf now in contest is constructed. In pursuance of the scheme by which a city with streets, lots, and squares was laid out on this land, he conveyed it in trust to Beall and Gantt. They were to lay it out into streets, squares, and lots. When this was done, the title in fee of the streets, as well as of such squares as were to be reserved for public uses, was to vest in the United States. Of all this property, after that was done, there was to be a fair and equal division between Young and the government, and Young's part was to be conveyed to him, and the other half to commissioners to be named by the President.

The riparian rights of land owners on the Potomac river were understood at that time as well or perhaps better than they are now, and the value attached then, and especially to the right to construct wharves, is shown clearly by the record and by the act of the legislature of Maryland of December 19th, 1791, cited in the beginning of the court's opinion. It therefore could not have escaped attention, if the entire waterway of the river, and the right of approach to it and use of it in regard to wharves and landing places, was vested exclusively in the United States, that no equal division was made of this important right, unless it was by the right attaching to each lot which, but for Water street, would be bounded by the river.

No equivalent is given to Young for this valuable right, on

Dissenting Opinion: Miller, Waite, Gray, JJ.

the supposition that it all vested in the United States; no express words are used conveying it to the United States or dedicating it to the public.  It cannot be successfully maintained that the right attaches as appurtenant to the street.  The uses of a street and of a wharf are entirely different, and while a dedication of a street to public use may not be inconsistent with the use of a part of it for a landing place, it cannot be said to have as appurtenant to it a right to build a wharf into the river.  If such a street had a definite width, it must happen that there would, by reason of the irregular curvature of the river, be detached pieces of land between it and the water.  To whom did this land belong, unless to the lot which would embrace it if its lines were extended to the water?  And if the lot did not embrace it, what equal division of this valuable land has ever been made with Mr. Young?  As it was the duty of the trustees to divide the whole land, it will be assumed that they did it, and this was their mode of doing it.

The cases of *Doane* v. *Broad Street Association,* 6 Mass. 332, and *Hathaway* v. *Wilson,* 123 Mass. 359, are directly in point. In the former case, a partition was made under which the parties claimed, and it was insisted that certain flats, which were the subject of the contest, did not pass as appurtenant to a wharf allotted to one of the parties, because both the wharf and the flats were land, and land cannot pass as appurtenant to land.  But the court said that, though the flats were not specifically mentioned, yet the duty of the commissioners to partition them, and their relation to the wharf, which could not be used without passing over them, led to the fair inference that on the partition they were intended to pass as part of the wharf property.

2. This view is confirmed by the language of the commissioners who made the division with Young, in the certificate which they gave him.  This was not in form a regular deed of conveyance, but is clearly intended to define the square or lots which fell to him in the division, and to remit him for his ownership to his original title, and for the nature of that ownership to the surrounding circumstances.  Taking square No. 472, one of those now in controversy, the certificate says that " the

whole of said square shall remain to the said Notley Young, agreeably to the deed of trust concerning lands in the said city." Here is a plain remission of his original title and right which, but for Water street, must include riparian rights also. And though this certificate is accompanied by a plat which shows Water street as lying between the square and the river, we are not able to see that this circumstance excludes the original riparian rights of Young, in the absence of any evidence that those rights were allotted to the government in the partition, or that Young anywhere received an equivalent for those rights unless he obtained it by this statement, that the "square shall remain to Young agreeably to the deed of trust made by him." No such deed was executed by the commissioners to purchasers of lots from the United States.

This view of the matter was taken by Judge Cranch in the case of the *Chesapeake and Ohio Canal Company* v. *Union Bank of Georgetown*, 5 Cranch C. C. R. 509, decided in 1838, and though the case is not fully argued by the court, the eminent ability of the judge who decided it, and his well-known accuracy as a reporter, and his knowledge of the local laws and customs of the city of Washington, entitle it to very great weight, as what he intended to decide is quite clear.

The careful and elaborate letter of the commissioners to the president, of July 24th, 1795, which states that "no wharves, except by the public, can be erected on the waters opposite the public appropriations, or on the streets at right angles with the waters;" but "with respect to the private property on the water," lays down regulations by which "proprietors of property lying on the water" are to be permitted to build wharves, and to erect warehouses thereon, leaving spaces at certain distances for cross streets, evidently uses the words "public appropriations" as distinct from "streets," and as designating the lots and squares set apart with the President's approval for the public use; and by prohibiting the erection of private wharves at the end of "the streets at right angles with the water," and omitting to mention the shores by the side of other streets, clearly implies that such shores are not covered by the prohibition, but are to be treated as included in "the private property on the water."

The lot set off to the United States, and afterwards sold to Morris and Greenleaf, is within the same principle.

The declaration in the preliminary contract of 1793, between the commissioners and them, that the latter were entitled "of course to the privilege of wharfing annexed" to these lots, while not evidence of a contract to control the terms of the subsequent more formal instrument, is of weight as showing what at that time was understood to be included in a description of the lots.

When to this we add that no act of Congress has ever asserted ownership of these wharves or landing places, or the rights of a riparian owner, while they have conferred on the authorities of the District the power of regulating wharves, private and public, we are forced to the conclusion that these rights are left with the owner of the squares certified to Notley Young in the division with the United States.